413 So.2d 949 (1982)
Ruby CROCKETT
v.
ST. PAUL INSURANCE COMPANY, et al.
No. 14724.
Court of Appeal of Louisiana, First Circuit.
April 13, 1982.
Rehearing Denied May 25, 1982.
Hobart O. Pardue, Jr., Springfield, for plaintiff.
Denis Paul Juge, New Orleans, for defendants.
Before COVINGTON, COLE and WATKINS, JJ.
*950 COVINGTON, Judge.
The plaintiff, Ruby Crockett, brought this suit seeking workers' compensation benefits for an accident which allegedly occurred on November 20, 1978. Named as defendants are the plaintiff's employer, Seventh Ward General Hospital, and its workers' compensation insurer, St. Paul Insurance Company.[1] After trial on the merits, the court rendered judgment in favor of the plaintiff and against the defendants, in solido, for weekly compensation in the amount of $120.00 per week beginning November 20, 1978, during the period of her disability. The judgment further ordered that all accrued amounts, with interest, be paid in a lump sum. The defendants were ordered to pay all medical expenses, expert witness fees and costs of the litigation. The plaintiff was denied penalties and attorney's fees. The defendants have perfected this appeal. We affirm.
The primary issue on this appeal is whether the evidence supports the trial court's finding that the plaintiff was totally and permanently disabled as a result of her injury. The record shows that at the time of her injury, she had been employed by Seventh Ward General Hospital for a period of about 19 years, and was receiving wages at the rate of $4.10 per hour for an eight hour day as a respiratory technician. On November 20, 1978, she injured her back while turning a patient. She stated that "something popped in my back and hurt my back." She saw Dr. Merlin Allen about 30 minutes after the incident, and the doctor prescribed medication. She also reported the injury to her supervisor and turned in an incident report. Dr. Allen verified that he had seen the plaintiff and prescribed medication for her on that occasion. He has continuously treated her thereafter.
Although experiencing pain, Mrs. Crockett continued to work at the hospital. Dr. Allen testified that she "worked with pain." The plaintiff stated: "I could work as long as I took pain medicine." The record shows that she has experienced substantial pain as a result of her accident which prevents her from engaging in further employment.
Concerning his initial examination, Dr. Allen testified as follows:
"It was obvious and still is that Mrs. Crockett did have some type of traumatic injury to the back and in lifting the way she said she had received this injury to her back."
Dr. Allen prescribed soma compound which is a muscle relaxant, and advised her to seek physical therapy and ultrasound treatment in the hospital.
Dr. Allen next saw Mrs. Crockett in his office on November 29, 1978. He testified regarding that visit:
"The day I did see her here in the office and made an examination she had what I described as a very simple lumbarsacral muscle spasm and now this may be simple to us but it is very painful to the patient. And she was not able to really stand very well and she certainly was having difficulty.
. . . . .
"... So the visit of November 29th was to reinforce the fact she needed conservative medical management which included muscle relaxers, ultrasound in the hospital and heat and at this time I put her on a new drug which is Nalfon, which is a drug we use for inflammation, it's kind of anti-arthritic and also I gave her a prescription for Empracet which is a pain relieving medication that has codeine in it. And I told her that I would see her in the hospital and if she needed to come back to the office because everyday between November 29th, 1978 and really October 10th, 1979 I just don't know how many times I would see her in the hall and kind of perform a halfway physical examination and give her medications on refill."
Dr. Allen then saw Mrs. Crockett in his office on October 10, 1979. He gave his findings:

*951 "This time she was very, very tender in the back of the L-4 region and at this time I really felt as though that we were dealing with a possible disc."
Dr. Allen again saw Mrs. Crockett on October 31, 1979, and related her complaints as follows:
"... she stated she was really having a terrific amount of problems with her back, as a matter of fact the medication for pain that I was giving her, the Empracet was not really holding pain and she needed something stronger. It was at this time I felt as though that we needed to certainly consider the fact that she could see an orthopedic surgeon or even a neurosurgeon because anytime you start taking Percodan for back pain you move up the ladder and we needed to do something different."
She again saw Dr. Allen on December 12, 1979, and his report indicated that she was still experiencing pain, although some improvement was noted. He saw her on February 13, 1980, and prescribed stronger medication for the back inflammation.
Dr. Allen continued to treat Mrs. Crockett, and made the following notation concerning her visit of March 31, 1980:
"She stated she wasn't able to work without pain and she could hardly do her housework, certainly could not do any lifting... Physical examination of the back revealed just almost the same thing it did each time, she had tenderness in the lumbarsacral area which is around L-4, 5-S1."
Dr. Allen expressed his opinion concerning Mrs. Crockett's condition:
"... I really believe in my professional opinion she does have some type of early disc problem."
Dr. Allen corroborates plaintiff's testimony about her trying to obtain work and her inability to do so. His testimony in this regard is as follows:
"The last visit I saw her was March 31st, 1980 she was trying to work as a sitter with old people. And this is when she told me she was unable to pull on old people or to lift. That's true and usual, you know. This was the only employment as far as I know that she had."
Dr. Allen testified, regarding Mrs. Crockett's pain, as follows:
"Q. When you first saw her on November 29th, 1978 you have prescribed Nalfon and some pain pills?
A. Yes, some are compound and Empracet No. 3. She had the Empracet No. 3 in the hospital because I had given that prescription earlier. These were two new refills.
Q. You gave her pain pills because she was in pain?
A. Yes.
Q. She complained of pain?
A. Yes.
Q. And the pain would be compatible with your objective clinical findings?
A. Yes.
Q. I think you noted lumbarsacral muscle spasms?
A. Yes, that's what she has.
Q. Which was objective clinical findings that represent pain?
A. That is correct.
Q. And so I take it she continued to work at the hospital during this time?
A. She did, she was a very faithful, noble person, she worked with pain. I don't know whenever she quit work.
Q. When she was working she was working in pain?
A. Yes, I would say yes. She would have to have been taking the medicines she's on.
Q. I know pain can only be determined in the mind of the one suffering it, would you say she was working in substantial pain?
A. I think that if you base it like mild, moderate or severe, it would be moderate.

*952 Q. If she did have a ruptured disc or nerve root compression, whatever was causing it, that can cause moderate to substantial pain?
A. Oh, yes.
Q. Is it a type of pain that could affect her working ability?
A. Yes, sir." (Emphasis added.)
Dr. Herbert Plauche, an orthopedic surgeon, examined Mrs. Crockett on December 18, 1979. His examination elicited positive objective clinical findings which corroborated the findings of Dr. Allen, of muscle spasms in the back. Dr. Plauche found a moderate degree of muscle spasm in the lumbarsacral area and restriction of motion in all planes due to active muscle splinting. There were complaints of pain in the low back during the straight leg-raising test. Dr. Plauche further testified that he could not definitely rule out the possibility of a lumbar disc at L-4, L-5 level without a myleogram.
After considering the plaintiff's testimony[2] and that of the medical experts[3], the trial judge concluded that the injury was job-related, and "that plaintiff would be unable to engage in any type of gainful employment without experiencing substantial pain and therefore, plaintiff is totally and permanently disabled." See Whitaker v. Church's Fried Chicken, Inc., 387 So.2d 1093 (La.1980); Schriner v. Riverside Companies, Inc., 378 So.2d 1035 (La.App. 2 Cir. 1979), writ denied, 380 So.2d 1368 (La.1980).
Mrs. Crockett was examined by Susan Smith, an occupational therapist, on behalf of plaintiff's counsel. Her opinion regarding Mrs. Crockett was that Mrs. Crockett would not be able to perform any job in the competitive job market. The occupational therapist stated:
"Q. Do you feel that based upon her limited functional capacity, if she would be able to meet the functional demands in any other job in the competitive labor market?
A. She is in her lateearlylate career years, early fifties. She has not done any type of work except for service work and unskilled work. So does not have, except for her respiratory therapy technician work a great number of transferable skills at this time. She cannot sit nor stand in a functional position to work and cannot engage in physically active work. So she would not be able to meet the physical demands of any job in the competitive labor market.
Q. This is due to her significantly limited functional capacities?
A. Yes, and her endurance."
Jennifer Staley, a rehabilitation counselor, examined Mrs. Crockett on behalf of the defendants. She testified in her deposition:
"Q. Now, did you observe the duties of a respiratory technician?
A. Yes, I have it.
Q. What was your evaluation as to Ms. Crockett's ability to perform these particular tests?
A. Of the technician, the respiratory technician?
Q. Yes.
A. Well, I don't believe she would be able to return to that. In observing that job, a lot of times the technician is not doing anything strenuous, *953 but then in a crisis situation, in an emergency they may have to, for instance, run to get some equipment. They may have to stoop or lift a patient. So, I just don't think that would be the best thing for her."
Under the "odd lot" test[4] as announced in Oster v. Wetzel Printing, Inc., 390 So.2d 1318 (La.1980), an injured employee is entitled to total, permanent disability compensation if he is not able to perform any services other than those which are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist, so that he falls into the "odd lot" category, unless the employer or insurer establishes that reasonably suitable work is regularly available to the employee. See also LSA-R.S. 23:1221(2); Lattin v. HICA Corporation, 395 So.2d 690 (La.1981). We find Dusang v. Henry C. Beck Builders, Inc., 389 So.2d 367 (La.1980), relied upon by appellants, factually distinguishable in that in Dusang a skilled worker was still able to perform a skilled craft, while in the present case there is no evidence that Mrs. Crockett could do any work other than work categorized as of the "odd lot" variety, if indeed she could do that type of work. In addition, the "odd lot" category had not yet been clearly defined by our Supreme Court at the time of the Dusang decision, as was later done in the Oster case. See 389 So.2d at 371.
The record does not reveal that the defendants have shown that some kind of reasonably suitable work is regularly available to the plaintiff. The most that can be said for the defendants' expert testimony in this area is that it suggests that the plaintiff could perform light, sedentary jobs, such as a sitting service, which is obviously of the "odd lot" variety. Applying the Oster rule to the present case, we conclude that Mrs. Crockett falls in the "odd lot" category. See Lemoine v. Marksville Industries, Inc., 391 So.2d 528 (La.App. 3 Cir. 1980), writ denied, 396 So.2d 1325 (La.1981).
The "odd lot" doctrine, as expressed in Oster, entitles an employee to compensation for total disability when, as a result of a job-related injury, he is disabled from performing any suitable work for which a reasonably dependable market exists. See Calogero v. City of New Orleans, 397 So.2d 1252 (La.1980).
Appellants also contend that, in the event the plaintiff is entitled to benefits, they should not begin until she left her employment (or was discharged therefrom) on September 5, 1979. We disagree. Hartsell v. Hooker Chemical Corporation, 288 So.2d 417 (La.App. 4 Cir. 1973), writ denied, 292 So.2d 243 (La.1974). Since Mrs. Crockett was required to work in pain, the commencement date for her benefits should properly be *954 November 20, 1978, because that was the date of the onset of her pain and, thus, her disability.
Next, appellants contend that the trial court was in error in awarding legal interest on each weekly payment from the due date of each until paid rather than legal interest from date of judicial demand which, they allege, is the proper method of interest computation. There is no merit to this contention. In workmen's compensation proceedings, interest on weekly benefits are properly awarded from the date due. Rachal v. Highlands Insurance Company, 355 So.2d 1355 (La.App. 3 Cir. 1978).
Finally, appellants argue that the trial court erred in awarding the plaintiff payment of past medical expenses. Although the trial court could have been more definite, we find no error. The defendants are responsible for the payment of medical expenses incurred in connection with the job-related injury. There was no prejudice to defendants by the wording of the judgment in the instant case relating to such payment. LSA-R.S. 23:1203; Andersen v. Eagle Asbestos Company, 355 So.2d 1082 (La.App. 4 Cir. 1978); see also Wilson v. Ebasco Services, Inc., 393 So.2d 1248 (La. 1981).
For the reasons assigned, we affirm the judgment appealed at the appellants' costs.
AFFIRMED.
NOTES
[1] The insurer is called "St. Paul Insurance Company" in the petition and in the judgment; however, its pleadings show that its proper name is "St. Paul Fire & Marine Insurance Company."
[2] The trial court observed that the only evidence of the job-related injury was the testimony of the plaintiff. The court below accepted Mrs. Crockett's testimony as establishing this element since the testimony was not contradicted and there were no circumstances casting suspicion on the reliability of the plaintiff's testimony. See West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979).
[3] Although Dr. Roger Blitz, the defendants' expert, concluded that there were no objective indications of an orthopedic pathology, the trial court was justified in giving greater weight to the testimony and opinion of Dr. Merlin Allen. Generally, the testimony of the claimant's treating physician is afforded greater weight than that of an examining physician or specialist who examines the claimant merely for purposes of evaluation for a particular litigation. Gowers v. Gour, 350 So.2d 935 (La.App. 2 Cir. 1977), writ denied, 352 So.2d 1046 (La.1977).
[4] In Lattin v. HICA Corporation, 395 So.2d 690, at 693 (La.1981), the Supreme Court stated:

"Under the odd lot doctrine, a claimant is considered totally disabled if his injury makes him an odd lot in the labor market, that is, one capable of obtaining employment periodically but one whose services are so limited in quality, dependability or quantity that a reasonably stable market for his services does not exist. An odd lot claimant need not be absolutely helpless to qualify for total disability. If the claimant can prove that his physical condition, mental capacity, education, training age or other factors combine to place him at a substantial disadvantage in the competitive labor market, he has made out a prima facie case for classification in the odd lot category. This satisfies his burden of proving that he should be awarded benefits for permanent and total disability. The employer or insurer must then show that some form of gainful occupation is regularly and continuously available to the employee within reasonable proximity to the employee's residence.
"The odd lot doctrine is also applicable to substantial pain cases because a worker who, due to his injury, can function only with substantial pain or with the help of fellow workers may not be considered a particularly desirable employee. Thus, if a claimant's pain appreciably limits the types of work available to him and greatly diminishes his ability to compete in the labor market, he can be treated as an odd lot worker and be awarded total disability, unless there is proof that jobs are realistically available to him. On the other hand, if a worker cannot perform the same work that he did before his injury because it causes him substantial pain, but he has the mental capacity to perform other jobs which are available, he should be considered partially disabled."