CHEHARDY, Judge.
Plaintiff, Mark Keller, instituted this suit for workmen’s compensation benefits and penalties and attorney’s fees against his employer, Kaiser Aluminum & Chemical Corporation.
Following trial, judgment was rendered in favor of plaintiff for benefits for a period of 175 weeks at a rate of 66⅜% of his salary on the date of the injury, plus interest from date of judicial demand. The claim for attorney’s fees was denied.
A supplemental judgment was rendered on the same day defining plaintiff’s award as follows:
“* * * based on an hourly rate of $7.67 per hour, which equals $306.80 per week. The sum totals $53,690.00 for 175 weeks, of which Plaintiff is entitled to 66%%, or a total of $35,558.88.”
Defendant has appealed.
The parties agree on the following facts:
On September 7, 1978 plaintiff was injured in the course and scope of his employment as a cylinder filler helper at defendant’s plant in St. John the Baptist Parish. At that time he was engaged in a loading operation with the use of a fork lift truck. As he stepped off the fork lift he suffered an injury to his left knee. He was treated at the company’s first aid station and returned to work for a short period later that afternoon. However the condition of his knee worsened and later that day he was taken to Dr. Lawrence McManus, who was substituting for Dr. Turner, the company doctor who was on vacation.
Plaintiff was unable to return to his job for approximately one month, at which time he was assigned to light duties. He continued under the care of Dr. McManus and was referred by him to Dr. Robert Mimeles, an orthopedic surgeon.
Mimeles recommended surgery which was performed on November 30, 1978. Shortly after the surgery a staph infection set in while plaintiff was hospitalized, greatly retarding plaintiff’s progress, and two further operations were necessary because of the infection.
Plaintiff returned to work full time on September 4, 1979. He was in the same work classification as the one he held prior to his injury, but the duties were not identical to those he had previously performed. The pay rate was the same plaintiff would have earned if there had been no accident and no change in his duties.
Plaintiff was unable to work for 434A weeks following the accident and was paid compensation benefits of $141.00 per week, for a total of $6,143.56. Kaiser also paid all of plaintiff’s medical expenses, which amounted to $19,905.72.
Following his return to work plaintiff filed this suit seeking additional compensation under the provisions of the Louisiana Workmen’s Compensation statutes. He claims total and permanent disability benefits allegedly due because of the severe limitations placed upon him by the injury sustained.
In this court, appellant contends the trial court erred in the following respects:
1. The award is not supported by the evidence;
2. The award as computed in the supplemental judgment is erroneous; and
3. Defendant is entitled to credit for weekly compensation benefits previously paid.
The record consists of the testimony of plaintiff; Dr. McManus; John Whitfield, the defendant’s personnel supervisor and workers’ compensation administrator; the deposition of Dr. Mimeles and various hospital and medical records. In arriving at our conclusions we have carefully considered all of the testimony with particular attention to the medical evidence.
Whitfield testified as to plaintiff’s job description prior to the accident. His duties as a cylinder filler helper were to clean and repair the cylinders, to change the valves on the cylinder bottles, to assist on the line operation, to fill the bottles, to help package and store them, and to assist in the cylinder fill operation.
*268 The personnel records indicate medical restrictions following plaintiff’s return to work were that he should not stand all the time, not walk half the time, not climb when it involved the legs only, and legs and arms, he should not perform intermittent crouching and should not work overtime.
(It is to be noted that plaintiff had voluntarily removed himself from the overtime list and was not working overtime prior to the injury.)
Plaintiff testified he had injured his knee playing softball in the early 1970s, but for the past 7 or 8 years, prior to his current injury, he had no problems associated with his leg or his knee. He described his accident and medical treatment by Dr. McMa-nus, whose testimony we will discuss in detail later. After one month, plaintiff testified, he returned to light duty on the recommendation of his doctor, but even limited duty proved aggravating.
Plaintiff was then referred to Dr. Mí-meles, who sent him for tests. The doctor indicated a cartilage and a cyst should be removed. The operation was performed on November 30, 1978, and a day or so thereafter a staph infection set in, causing serious complications. Two further operations were performed which we will discuss later in detail in the medical testimony.
Plaintiff returned to work on September 4,1979 with the permanent restrictions outlined above. After his return his duties consisted of inspecting bottles to determine if the valves needed to be changed or removed, or if they required cleaning with soap and steam and a new valve installed.
Plaintiff stated he wears a special brace daily because his knee still has a tendency to give out. He continues to have knee problems as the day wears on.
Since plaintiffs return to work in 1979, he has missed no work because of his knee and is not presently scheduled to see any doctors due to his injury. He is now making more money per week than he was at the time of the accident. At the time of the injury he was earning $7.76 per hour, and at the present time he earns $10.89 per hour. During the entire time he was out of work because of his injury he was paid full compensation.
Dr. McManus testified plaintiff came to the office on September 7,1978 in considerable pain and with substantial swelling of the left knee. Plaintiff described his injury at work and the doctor found obvious injury — a hematoma and bleeding in the area. The knee was asperated and plaintiff was placed on crutches. Treatment consisted of ice packs, an anti-inflammatory drug, bed rest at home and heat to the knee. The preliminary diagnosis was hemostasis.
On September 11 plaintiff was much improved and a heavy duty elastic knee support was prescribed. He was also seen on September 18 with more swelling and another 25 cc’s of blood was asperated. There was no evidence of cartilage or ligament injury and the knee was stable.
On September 25 there was slight swelling but no tenderness. Crutches were discontinued and the patient was referred to Dr. Turner, who had returned from vacation. Dr. McManus has not seen plaintiff since that time. No x-rays were taken during the period of his treatment because McManus concluded the injury was a simple type that should not produce a fracture.
Dr. Mímeles stated he first saw plaintiff on October 24, 1978. A history was taken relative to the accident and the previous medical treatment in connection therewith.
Upon examination the doctor found mild effusion (swelling) and joint line tenderness which indicated a possible torn cartilage. There was some arthritis under the kneecap. An arthrogram was performed indicating plaintiff had a torn medial meniscus.
Plaintiff was hospitalized on November 29, 1978 and knee surgery was performed — an arthrotomy involving removal of the medial meniscus, shaving of the chondromalacia of the patella and advancement of the vastus medius obliquus muscle, which the doctor described as “quite a bit of surgery.”
Following surgery plaintiff developed an infection in the knee accompanied by se *269 vere bleeding. He required further surgery on December 13 involving opening the knee, irrigating it and closing it.
A hemotologist was called in because of persistent bleeding and plaintiff required 10 to 12 units of blood, not due to blood in the knee joint, but because the patient he-matolized in such a way that his own body ate up his blood cells.
This led to the complication of infection in plaintiff’s knee leading up to the surgery on December 13. The second operation succeeded in getting rid of the infection, but on December 17 another operation was necessary to put irrigation tubes in the knee for suction and fusion.
After the infection was healed, the doctor recommended a Lenox Hill brace because plaintiff had definite laxity in the knee. When you take out a cartilage you do not have the same stability. The brace provided plaintiff with the needed stability and he was able to return to work.
Plaintiff was seen on several occasions after the operation, the latest examination occurring the week before the doctor’s deposition (July 8, 1981). At that time the doctor found the knee was not abnormally lax, that plaintiff no longer needed the Lenox Hill brace and could use a much milder brace. The doctor suggested a sub-luxing knee brace with little hinges on the side, which would be much less cumbersome than the large steel brace plaintiff was wearing.
In fact Mímeles concluded plaintiff did not need any type of external device except for long periods of walking. He stated plaintiff has a very stable knee now, although it was more arthritic, which the doctor attributed somewhat to the aging process. Plaintiff had full range of motion, could bend his knee completely back and straighten it out all the way.
The doctor initially gave plaintiff a rating of 25% disability of the knee. Normally the removal of a cartilage would be about 13% to 14% disability, but an additional disability rating of 5% to 8% was given for the subluxing kneecap that the doctor concluded could be directly related to the injury.
Considering all of the possibilities Dr. Mímeles then gave plaintiff a 30% disability rating because his condition may get progressively “a little worse.” If plaintiff keeps his weight down and does exercise he may do fine, if not he may need further surgery 10 or 20 years later. Mímeles felt plaintiff was not limited at this time in the amount or the ability to climb up and down ladders, but he did not recommend it. He found plaintiff was not permanently disabled. He is able to do all of the things he wants to do and if he does not do a lot of walking, climbing, stooping or bending he should continue to do fairly well.
While giving plaintiff a 30% disability rating he indicated there were very few things he could not do if he wanted to.
There was no reason plaintiff could not continue to hunt and fish, and he is back at gainful employment, so Mimeles found he was not disabled at this time. He was of the opinion that 30% disability was a high rating. He would not be surprised if 4 or 5 other doctors would give a lesser disability rating. However, all things considered, knowing of the 3 operative procedures he had performed and having followed plaintiff’s case closely, he thought that while a disability rating of 30% might be high it was nevertheless fair.
We have discussed the medical evidence in detail, because the trial court made an award based upon total and permanent disability. Appellant claims appellee is entitled to an award based upon the 30% disability rating. We agree with appellant’s position.
In its reasons for judgment the trial court recognized that plaintiff suffered no diminution in earnings and concluded the award should be determined under the provisions of the statute relating to specific disabilities.
The trial court awarded plaintiff ⅜ of his wages for 175 weeks under the provisions of LSA-R.S. 23:1221(4)(h) as though plain *270 tiff had suffered the full loss of use of his leg.
However, the medical evidence shows that plaintiff sustained only a 30% disability of that leg and the award should properly be computed under the provisions of R.S. 23:1221(4)(o), which at the time of the accident provided as follows:
“In all cases involving a permanent partial loss of the use or function of the members mentioned hereinabove, compensation shall bear such proportion to the amounts named herein for the total loss of such members as the disability to such members bears to the total loss of the member, provided that in no case shall compensation for an injury to a member exceed the compensation payable for the loss of such member.”
Plaintiff remains gainfully employed despite the injury he sustained and has suffered no diminution in earnings. His right to additional compensation is derived from the specific loss provisions of the compensation statute. R.S. 23:1221(4); Bernal v. Employers Commercial Union Ins. Co., 329 So.2d 907 (La.App. 2d Cir.1976); Malone-Johnson “Workmen’s Compensation” 2d Ed., La.Civil Law Treatise, Vol. 13, Sec. 282, pp. 649-650.
If the loss of use or function is partial, the provisions of R.S. 23:1221(4)(o) apply and require the award to reflect the proportionate disability only. Chipman v. Insurance Co. of North America, 389 So.2d 432 (La.App. 2d Cir.1980); Evans v. Naihaus, 326 So.2d 601 (La.App. 4th Cir.1976).
The correct method of computation is described in Bernal v. Employers Commercial Union Ins. Co., supra (cited by the trial court in its reasons for judgment).
In computing the award under R.S. 23:1221(4)(o), the court used the weekly earnings at the time of the accident as a basis, applied the statutory percentage, and then applied the disability rating to determine the applicable weekly compensation. The total award was the weekly rate established by the formula to be paid for the statutory period of 175 weeks. This method of computation was also utilized in Kelly v. City of New Orleans, 414 So.2d 770 (La.1982), and Chipman v. Insurance Co. of North America, supra.
Applying the Bernal formula to the facts in the instant case, we find the benefits due as follows:
Plaintiff’s hourly wage $ 7.67
Hours worked per week X 40
Average Weekly Wage $ 306.80
Statutory Percentage X 66 2/3⅞
$ 204.54
Assigned Disability Rate X 30⅞
Weekly Compensation Rate $ 61.36
Statutory Period X 175 weeks
Total benefits due under
R.S. 23:1221(4)(o) $10,738.00
We agree the evidence does not support an award for total and permanent disability benefits and that the computation found in the supplemental judgment is erroneous. We therefore will amend it accordingly.
Appellant further claims credit for benefits already paid.
During the period plaintiff was unable to work he was paid weekly benefits under the provisions of R.S. 23:1221(1) for temporary total disability. This period of disability extended from September 7, 1978 to October 9, 1978, and from November 29, 1978 to September 4, 1979, a period of 43⅞⅞ weeks. He received $141.00 each week for those periods of disability, or a total of $6,143.56.
Defendant claims a credit in that amount against its liability to plaintiff for his permanent partial disability.
At the time of this accident, LSA-R.S. 23:1223 provided:
“Where compensation has been paid under subdivisions (1), (2), or (3), of R.S. 23:1221, the amount of such payment shall be deducted from any compensation allowed under subdivision (4) thereof or under Sub-part C of this Part.”
Under the above-quoted statute, appellant is entitled to credit for benefits paid. Thus the actual award due plaintiff is computed as follows: total benefits due under *271 R.S. 23:1221(4)(o) [175 weeks], $10,738.00, less credits for benefits paid, $6,143.56 = $4,594.44 benefits due.
Accordingly for the reasons assigned the judgments appealed from are amended to reduce the compensation benefits awarded plaintiff from 66%% of plaintiffs salary for a period of 175 weeks from the date of the injury (based upon an hourly rate of $7.67 per week, which equals $306.80 per week) to 30% of $306.80 per week for a period of 175 weeks, subject to credit for amounts already paid, with interest from due date of each payment until paid.[1]
As thus amended, the judgment appealed from is affirmed.
AMENDED AND AFFIRMED.

. We note ex proprio motu that the original judgment awarded interest from date of demand. Interest is properly awarded in compensation matters from the due date of each payment. Crockett v. St. Paul Ins. Co., 413 So.2d 949 (La.App. 1st Cir.1982); Chisholm v. L.S. Womack, Inc., 424 So.2d 1138 (La.App. 1st Cir.1982).