469 So.2d 369 (1985)
Patsy Ann HUGHES, Plaintiff-Appellant,
v.
GENERAL MOTORS GUIDE LAMP DIVISION, Defendant-Appellee.
No. 16982-CA.
Court of Appeal of Louisiana, Second Circuit.
May 8, 1985.
Rehearing Denied June 7, 1985.
*371 LaCroix & McKeithen by Leslie L. LaCroix, Jr., Monroe, for plaintiff-appellant.
Hudson, Potts & Bernstein by Gordon L. James, Monroe, for defendant-appellee.
Before JASPER E. JONES, FRED W. JONES, Jr., and LINDSAY, JJ.
JASPER E. JONES, Judge.
Patsy Ann Hughes, plaintiff in this worker's compensation action, appeals a judgment rejecting her claims for compensation benefits, medical expenses, penalties and attorney's fees arising from an off-the-job accident which allegedly aggravated a pre-existing knee injury she sustained in a prior work related accident. We reverse.
Plaintiff initially injured her right knee in a work related accident on March 9, 1982. At the time of the accident plaintiff was performing her duties as a maintenance engineer at the General Motors Guide Lamp plant in Monroe, Louisiana. She was working the third shift from 10:30 p.m. until 7:00 a.m. The accident occurred at approximately 12:30 a.m. while plaintiff was removing supplies from a metal cabinet. When she reached up to get some supplies from the top of the cabinet she jammed her knee into the cabinet door. She immediately felt severe pain. After a few minutes the pain subsided and plaintiff completed her shift. As she was preparing to leave work the knee popped, again causing plaintiff severe pain. Plaintiff waited a few minutes for the pain to subside and tried to go home. On her way out of the plant a supervisor, Ray Siebold, observed that plaintiff was limping and after she informed him of the above series of events, he sent her to the company nurse. The nurse, Juanita Winegeart, found a small bruise, about the size of a quarter, on the inside of plaintiff's knee. Nurse Winegeart gave plaintiff an analgesic balm for her knee and recommended an ice pack be placed upon the knee. The nurse directed plaintiff to obtain an appointment with the company doctor.
The following day plaintiff was examined by Dr. Sol Courtman, the company doctor. Dr. Courtman found marked swelling in the knee and a bruise directly to the front of the knee. After a limited examination in which he took x-rays that revealed no bone damage, Dr. Courtman determined plaintiff sustained only a bruised knee. He prescribed some anti-inflammatory and pain medication and advised plaintiff to stay off work and return to his office in about a week.
Plaintiff attempted to work prior to the expiration of a week but the efforts caused her considerable discomfort. She returned to Dr. Courtman's office on March 16. On this occasion Dr. Courtman noticed a decrease in the swelling. He advised plaintiff to stay off work another week.
Plaintiff returned to work on March 23 and worked until she suffered her second accident on June 5, 1982.[1] During this period of time she also worked part time, from 18 to 22 hours per week, as a waitress at Ramada Inn. Prior to the second accident plaintiff saw Dr. Courtman again on March 31 and April 14. Dr. Courtman testified that plaintiff did not complain about any problems with the knee on these visits and he was of the opinion the initial injury had completely healed by April 14.
On June 5, 1982 plaintiff reinjured her right knee while entering her car to leave a picnic. On a General Motors' claim form *372 she stated that as she was getting into her car to leave the picnic she slipped and twisted her knee and was in severe pain. At trial she testified that when she attempted to get into her car the knee popped causing severe pain. Plaintiff further testified that she neither slipped nor twisted her knee. After the accident plaintiff was carried to the hospital by a friend. An emergency room doctor at the hospital allegedly bandaged her knee and told plaintiff to see her family doctor.
Plaintiff was off work for approximately two months, until August 10, 1982, following the second accident. During this period of time she was treated by her family doctor, Dr. R.T. Armstrong, and by an orthopedic surgeon, Dr. James O. Manning. These doctors did not testify at trial; however, reports prepared by each were admitted into evidence. The reports establish that Dr. Armstrong treated plaintiff on June 7, 14, 28 and July 12 and 23, 1982 and Dr. Manning treated her on June 25 and July 28, 1982. The reports also establish that both doctors diagnosed plaintiff's knee injury as a contusion and stress injury to the medial retinaculum of the right knee.
A few days after the second accident plaintiff applied for worker's compensation benefits from General Motors. Her claim was denied because the accident was not work related. However, during the period of time she was off work because of her knee plaintiff was paid a total of $1,691.00 under a special company benefit plan. Before receiving these benefits she had to sign an agreement to the effect that in the event the claim was found to be compensable she would reimburse the company.[2]
After plaintiff returned to work on August 10, 1982 she continued to experience problems with her knee. She was eventually examined by Dr. Baer Rambach, an orthopedic surgeon, on March 22, 1983. Dr. Rambach found she was experiencing some tenderness to the medial collateral ligament (a ligament on the inside of the knee) of her right knee. He also found some patella femural grating (a grating sound when plaintiff moved her leg) in the knee. At the time Dr. Rambach felt the knee would heal and he gave plaintiff instructions on the care of her knee and advised her to wear a knee support when she stood for extended periods of time.
Following the examination by Dr. Rambach plaintiff worked for a few days and was then hospitalized for an unrelated problem. As a result of the unrelated health problem plaintiff was off work from April 8, 1983 until September 2, 1983. After plaintiff returned to work the condition of her knee continued to deteriorate and she returned to Dr. Rambach for an examination on October 21, 1983. X-rays taken during this examination revealed a partial subluxation (dislocation) of the kneecap and Dr. Rambach recommended arthroscopic surgery. Plaintiff was admitted to the hospital November 8, 1983 and surgery was performed the following day. The surgery revealed the subluxation, chondromalacia (softening and destruction) to the inside surface of the kneecap and that the anterior cruciate ligament was partially torn and frayed. Dr. Rambach shaved the undersurface of the kneecap to make it smooth, removed the torn portion of the ligament and realigned the kneecap.
Dr. Rambach examined plaintiff on January 6, 1984 and advised her she could return to work on a restricted basis. Prior to her return to work, on January 12, 1984, defendant had her examined by an independent physician. Upon this doctor's advice defendant placed plaintiff on unrestricted duty. During the period of time plaintiff was off work due to the surgery she was paid $737.08 from the same benefit plan from which she was paid during the period of time she was off work following the second accident.
*373 At trial plaintiff testified the injury she suffered on March 9, 1982 had not healed prior to the June 5, 1982 accident and the second injury was an aggravation of the previous work related injury. Defendant contended the March 9 injury had completely healed prior to June 5 and there was no causal relationship between the two injuries. The trial judge found that the preponderance of the evidence supported defendant's position.
The primary issue raised by plaintiff's appeal is whether the second off-the-job injury and her resulting permanent disability, which Dr. Rambach rates as 20-25% of the right leg is causally related to the original on-the-job injury entitling plaintiff to worker's compensation benefits from General Motors. Does the second accident superimposed upon the residual disability of the first accident contribute with the first accident to create plaintiff's permanent residual knee disability? See Carter v. Rockwood Ins. Co., 341 So.2d 595 (La. App. 2d Cir.1977). If this issue is resolved in plaintiff's favor we must decide: the benefits to which she is entitled; whether defendant is entitled to a credit for the amounts paid plaintiff under the special benefit plan; and whether defendant is liable for penalties and attorney's fees.

Causal Relationship
The employee in a worker's compensation action bears the burden of proving his disability and its causal relation with the employment accident. Allor v. Belden Corp., 393 So.2d 1233 (La.1981); George v. Marcantel Feed Stores, Inc., 434 So.2d 440 (La.App. 3d Cir.1983). An aggravation of a work related injury is regarded as compensable and as resulting from the initial work-accident even if the aggravation occurs away from the job. Bolden v. Georgia Cas. & Sur. Co., 363 So.2d 419 (La. 1978); Stewart v. Hospitals Affiliates International, Inc. of Baton Rouge, 404 So.2d 944 (La.1981); Kelly v. City of New Orleans, 414 So.2d 770 (La.1982); George v. Marcantel Feed Stores, Inc., supra.
At the outset we note that it is unnecessary to determine exactly how the second injury occurred. The key question is the relationship between the second injury and the initial injury. Even accepting the version of the accident least favorable to plaintiff, that she slipped and twisted the knee, the injury is, nevertheless, compensable if the first injury had not healed and, as such, rendered plaintiff susceptible to further aggravating injuries. Kelly v. City of New Orleans, supra.
In support of her contention that the initial injury had not healed prior to the second injury plaintiff testified that she suffered swelling and pain in her right knee the entire period of time between March 9, 1982 and June 5, 1982. She stated the knee never stopped hurting although at times the pain was less severe than at others. She further stated that the only reason she returned to work on March 23, 1982, and worked at the second job, was out of economic necessity. She contends that she worked in pain the entire time. The fact plaintiff always believed the second injury was related to the first is substantiated by her statements on two claims forms filled out for defendant which were placed into evidence by the defendant. On both forms, one of which was completed June 14, 1982 and the other on June 28, 1982, plaintiff indicated that the first injury never healed and the second injury was related to the first.
To corroborate her testimony that she never recovered from the first injury and worked in pain plaintiff called six lay witnesses including her daughter, a neighbor and four co-employees from General Motors. The daughter lived with plaintiff during the interim between the two injuries. She testified that plaintiff was constantly complaining about knee pain and frequently limped. The neighbor, Mrs. Buff Rachall, testified she saw plaintiff on a regular basis between March 9 and June 5, 1982. She stated that plaintiff was always complaining about being in pain and that her knee was always swollen. Mrs. Rachall also stated she visited with plaintiff shortly before she left for the picnic and informed plaintiff she should not go because of the *374 condition of her knee. Three of the four co-employees testified unequivocally that they saw plaintiff regularly and every time they saw plaintiff between March 9 and June 5 she was limping and complaining of pain. The fourth co-employee testified to the same facts but was unable to remember the precise time frame.
In addition to her testimony and that of the lay witnesses plaintiff introduced the testimony of Dr. Rambach by deposition. Dr. Rambach was of the opinion following his examination of March 22, 1983 that the blow plaintiff sustained when she jammed her knee into the cabinet door weakened the medial collateral ligament and left the knee susceptible to further injury. He was also of the opinion that there was a direct relationship between the initial blow and the damage he found when he performed the surgery in November of 1983. He found at surgery that plaintiff, "had chrondromalacia of the kneecap. She had a partial subluxation, which means that the kneecap was actually a partial dislocation, which is a subluxation. The kneecap was not riding in the groove." We find it significant that Dr. Courtman in his examination of March 10, 1982 found "there was marked swelling and tenderness in front of her knee, about level with the lower part of her kneecap." This initial finding by Dr. Courtman substantially enhances Dr. Rambach's opinion that the pathology he found in the knee cap at surgery was related to plaintiff's initial injury. Dr. Armstrong, who examined and treated plaintiff in June and July, 1982, states on his several reports placed into evidence by the defendant that plaintiff had a sprained, contused, tender, swollen right knee. Dr. James O. Manning, orthopedic specialist of Jackson, Mississippi who examined and treated plaintiff on July 25 and July 28, stated on his reports placed in evidence that plaintiff had sustained a contusion and stress injury to the right knee. These observations and diagnoses do not differ substantially from those rendered by Dr. Courtman. While these examinations were conducted subsequent to plaintiff's June 5 accident, the diagnosis of each of the doctors reflect similar findings to those of Dr. Courtman on his initial examination following plaintiff's on-the-job accident of March 9 and to this extent corroborate plaintiff's testimony and the testimony of her lay witnesses.
Dr. Rambach also found at surgery a partial tear of the anterior cruciate ligament which he believed came from a rotational injury rather than the direct blow initial injury. He explained the relationship between the initial direct blow injury to the knee and the later occurrences complicating the knee injury in the following manner:
... Oncethe funny thing about the whole story is, and we are seeing this more and more with our arthroscopic work, once there is an insult to a major joint like the knee joint, no matter where it is in the knee joint, it can be the beginning of other problems developing. And, it can cause the patient to favor the knee. Once one favors the knee because of any type of injury to the knee joint, the quadriceps muscles become weak. Once the quadriceps muscles become weak it affects the entire knee cap mechanism which we call the quadriceps or patella mechanism. And, therefore, the knee cap doesn't glide smoothly. It can be untracked. The muscles on the outside of the thigh invariably become stronger than the muscles on the inside of the thigh because they are the ones that seem to always be affected by one favoring their knee. And, therefore, the kneecap has a tendency to be derailed. And, once it is riding the rail it becomes roughened. It is like a train which is derailed, it is not a smooth ride. And, so it is you know, it can be a vicious circle here going on. One thing leads to another, to another to another to another.
The only evidence presented by defendant on the question of whether the second injury was causally related to the first was the testimony of Dr. Courtman and the deposition of Dr. C.R. Hand. As was pointed out above Dr. Courtman testified that in his opinion the initial injury had completely healed prior to the occurrence of the second *375 injury. Dr. Hand is an orthopedic surgeon. He never examined plaintiff. His testimony was limited to giving his opinion as to whether the injuries were causally related based upon plaintiff's medical records, the accident reports and hypothetical situations posed by the attorneys. Given a factual situation most favorable to defendant he opined that there was no causal relationships between the two injuries. Given a factual situation most favorable to plaintiff he admitted there could have been a causal relationship. Dr. Hand evaluated his testimony in the following manner:
Q. Right. Well, my question was
A. It's a hypothetical question and if your question is hypothetical, the answer in medicine is nearly always "yes."
Q. Yes what?
A. Whatever you wanted to hear.
In spite of some inconsistencies, the totality of Dr. Hand's testimony is in accord with that of Dr. Rambach. He agreed the initial injury could have bruised the medial collateral ligament and that Dr. Rambach's findings at surgery could have been related to the initial injury. He further agreed that the initial injury could have weakened the knee and made it subject to subsequent injury.
The trial judge totally ignored the unrebutted testimony of the lay witnesses to the effect that plaintiff continued to suffer problems with the knee from the time of the first injury until the second injury. It is well settled that it is the totality of the evidence, medical and lay, which must be examined by the court in making its determination of whether a claimants' worker's compensation claim has been established. Tantillo v. Liberty Mutual Insurance Company, 315 So.2d 743 (La.1975); Lucas v. Ins. Co. of North America, 342 So.2d 591 (La.1977); Lamette v. Morrison Assur. Co., 461 So.2d 351 (La.App. 2d Cir.1984). In Tantillo at p. 749 the supreme court stated:
Lay testimony has great probative value in establishing certain facts, such as the existence and location of pain and the actual ability or inability of a claimant to perform certain physical functions or to pursue his regular employment... We conclude that lay evidence must be weighed with consideration for the medical fact to be established, of the conclusiveness and validity of the medical evidence and the materiality, relevance and reliability of the particular lay evidence, according to its focus, foundation and its source. (cite omitted)
In the instant case the testimony of plaintiff's lay witnesses was totally unrebutted and should have been given weight in the trial court's determination of whether the first injury healed prior to the occurrence of the second accident.
The trial judge relied upon the fact plaintiff worked for the defendant and moonlighted as a waitress at Ramada Inn for about two months before the June 5 incident and the testimony of Dr. Courtman to conclude the first injury had totally healed and plaintiff was enduring no residual pathology from it at the time of the second injury.
Plaintiff explained that economic necessity required her to work at the two jobs while enduring pain from the March 9 on-the-job knee injury and this explanation is reasonable. We conclude the only support for the trial judge's conclusion is the testimony of Dr. Courtman. This company doctor, who was not an orthopedic, admittedly made no examination to determine if plaintiff had any internal injury to the ligaments of her knee. He based his conclusion that the knee was totally well as of March 31 and April 14 upon the fact that the knee was not swollen at that time, his observation the bruise had disappeared, and the failure of the plaintiff to complain of pain in the knee. Dr. Courtman last saw the plaintiff approximately five weeks from the date of her March 9 accident. His conclusion is contradicted by the plaintiff and her five lay witnesses. The contusion of the knee found by Dr. Armstrong in June and July and by orthopedist Dr. Manning in July must have been a residual result from the March 9 accident as neither of the *376 so-called different versions of the June 5 accident involved any contact of the plaintiff's knee with any object which is normally necessary to cause a contusion. Whether her right knee was further injured by the simple act of placing her right foot into the car or by a superficial twisting maneuver as it was placed into the car would not explain the contusion found by Dr. Armstrong and Dr. Manning. The contusion portion of their diagnosis is compatible with plaintiff's first injury where her knee struck the cabinet door.
We note defendant listed Dr. Armstrong and Dr. Manning on the pretrial statement as its witnesses and did not call them as witnesses at trial. The defendant introduced the written statements of Dr. Armstrong into evidence and plaintiff introduced the report of Dr. Manning without objection by the defendant. Considering these circumstances we conclude defendant's assertion in brief, that plaintiff's failure to call these two doctors as her witnesses at trial creates a presumption that their testimony would be adverse to her claim, is totally without merit.
The testimony of Dr. Rambach that his findings at the time of his March 1983 examination and November, 1983 surgery were compatible with the March 9, 1982 accident and the testimony of Dr. Hand which is substantially in accord with Dr. Rambach's conclusions together with plaintiff's testimony and that of her lay witnesses, all of which is somewhat supported by reports of Dr. Armstrong and Dr. Manning, creates an overwhelming preponderance of evidence in favor of plaintiff.
We conclude the trial court's finding that the initial injury had completely healed prior to the occurrence of the second injury and for this reason there was no causal relationship between the two injuries is not supported by the record and is clearly wrong. See Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
We conclude that the knee pathology which disabled plaintiff and required surgery and left her with a 20-25% permanent residual disability of the leg was caused by the on-the-job accident and the off-the-job accident. The off-the-job accident and the additional knee injury caused by it were attributable to plaintiff's weakened damaged painful knee joint which was the residual result of her March 9 injury.

Benefits
Plaintiff seeks to recover under the schedule of benefits contained in LSA-R.S. 23:1221(4) for the 20-25% disability to her right leg. Since both accidents occurred prior to the 1983 amendment which requires a 50% disability before a claimant can recover for partial loss of use of a member, plaintiff is entitled to recover under the schedule of benefits.[3]Keller v. Kaiser Aluminum & Chemical Corp., 453 So.2d 266 (La.App. 5th Cir.1984); Kelly v. City of New Orleans, supra.
As it existed at the time of the accidents 23:1221(4)(h) provided that for the anatomical loss of use of a leg the claimant could recover 662/3% of his weekly wages for 175 weeks. Where the loss of use is partial the amount of the weekly benefits is limited to the amount obtained by the formula contained in 23:1221(4)(h) multiplied by the percentage of disability. See 23:1221(4)(o); Keller v. Kaiser Aluminum & Chemical Corp., supra.
The record does not clearly reveal plaintiff's weekly wages at the time of the accident but the litigants agree her wages were such that she would be entitled to the maximum weekly compensation which they agree is the sum of $183.00. To be entitled to this maximum plaintiff was making at least $275.00 per week. Applying the formula *377 contained in 23:1221(4)(h) & (o) to this weekly wage would entitle plaintiff to the sum of $45.75 weekly which is less than the minimum weekly compensation of $55.00 to which she would be entitled under the provisions of 23:1202. See Kelly v. City of New Orleans, supra. Plaintiff in brief contends she is entitled to the minimum compensation and therefore concedes that her weekly wages would justify no greater award and because the defendant has acknowledged the correctness of the maximum compensation it has conceded the minimum would be $55.00 per week.[4]
If plaintiff had received no compensation benefits from the defendant she would be entitled to $55.00 times 175 weeks or the amount of $9,625.00. The defendant is entitled to have deducted from this sum any amount plaintiff received under the provisions of 23:1221(1) which provides benefits for temporary total disability benefits. 23:1223; Keller v. Kaiser Aluminum & Chemical Corp., supra. The defendant paid plaintiff the sum of $287.57 as compensation benefits for the eight days she was off immediately following her March 9 injury which the defendant accepted as compensable. In addition to this sum plaintiff has received $2,428.00 from the General Motors Disability Advance Fund which defendant contends should be credited against any compensation award made to the plaintiff.
In order to receive a credit for sums paid an employee against his worker's compensation benefits the employer must show that the sums were paid and received as compensation. Chase v. Warren Petroleum Corporation, 168 So.2d 861 (La.App. 2d Cir.1964); Naquin v. Texaco, Inc., 423 So.2d 31 (La.App. 1st Cir.1982).
This sum was paid in weekly installments to the plaintiff. David Whitlock, the claims administrator, testified it was paid in lieu of compensation from a special fund maintained by the defendant. He testified, "It is called the General Motors Disability Advance Fund. It's an account when an employee is paid in lieu of worker's compensation until which time that the claim is determined to be worker's compensation." Whitlock testified that an employee was not entitled to receive payments from the GMDA Fund and also for workman's compensation and for that reason employees were required to sign an agreement to reimburse the company for funds paid out of the GMDA Fund in the event their disability was later determined to be compensable. The plaintiff signed an agreement by the terms of which she agreed to repay the voluntary advances made from this fund in the event her claim was found to be compensable.[5] We find the defendant is entitled to a credit in the amount of $287.57 paid as compensation plus $2,428.00 paid by *378 defendant from the GMDA Fund in lieu of compensation.
The plaintiff established that she is entitled to a judgment in the amount of $225.00 for medical expenses not paid by the defendant. She further established that she traveled approximately 2,380 miles obtaining medical treatment. She is entitled to reimbursement for the travel expense. LSA-R.S. 23:1203(C). Plaintiff did not establish the mileage cost but 16¢ per mile has been found reasonable in other cases and we shall fix her travel expenses based upon a cost of 16¢ per mile. See Young v. Hercules, Inc., 451 So.2d 109 (La.App. 3rd Cir.1984); McElhaney v. Belden Corp., 376 So.2d 539 (La.App. 3d Cir. 1979).

Penalties and Attorney's Fees
An employer shall be liable for penalties and attorney's fees for refusing to pay benefits within 60 days of receiving notice of the claim when its refusal is arbitrary, capricious or without probable cause. LSA-R.S. 23:1201.2. Whether or not a refusal to pay benefits is arbitrary, capricious or without probable cause depends primarily on the facts known to the employer at the time of its action. Edwards v. Hardford Ins. Co., 445 So.2d 499 (La. App. 2d Cir.1984); Lamette v. Morrison Assur. Co., supra.
Dr. Courtman had reported to the defendant that the initial injury healed prior to the occurrence of the second accident which was not job related. Under these circumstances there was a legitimate factual dispute as to the causal connection between the two injuries and the plaintiff's right to compensation. Defendant's refusal to pay compensation was not arbitrary, capricious or without probable cause.
For the reasons assigned the judgment rendered herein is REVERSED AND SET ASIDE and there is judgment rendered in favor of Patsy Ann Hughes and against General Motors Corporation, Guide Lamp Division, for:
I. Worker's compensation under the provisions of LSA-R.S. 23:1221(4) in the amount of $55.00 per week commencing March 9, 1982 and for a period of 175 weeks subject to a credit of $2,715.00 for sums previously paid by the defendant, with judicial interest on each past due installment from due date until paid.
II. Unpaid medical expenses in the amount of $225.00 and for travel expenses in the amount of $480.80 with judicial interest on said sums from the date of judicial demand until paid.
All costs in the trial court and on appeal are assessed against the defendant.
NOTES
[1] Plaintiff missed a total of eight working days between March 9 and March 23. She was paid a total of $287.57 in compensation benefits for those days.
[2] David Whitlock, a claims administrator for defendant, testified that plaintiff was "allowed" to sign the reimbursement agreement. However, he also testified that she would not have received the majority of the benefits if she had not signed. She also received other payments through G.M. under a company provided health insurance policy.
[3] Acts 1983, 1st Ex. Sess., No. 1 which became effective July 1, 1983 added as subsection q the following provision to 23:1221(4):

(q) No benefits shall be awarded or payable in this Paragraph unless anatomical loss of use or amputation, as provided in Subparagraphs (a) through (o) of this Paragraph or loss of physical function as provided in Subparagraph (p) of this Paragraph is greater than fifty percent as established in the American Medical Association Guides to the Evaluation of Permanent Impairment, copyright 1977, by the American Medical Association.
[4] The same weekly wage is used in the computation of the maximum and the minimum compensation. LSA-R.S. 23:1202 provides:

... For injuries occurring on or after September 1, 1977, and before July 1, 1983, the maximum weekly compensation to be paid under this Chapter shall be sixty-six and two-thirds percent of the average weekly wage paid in all employment subject to the Louisiana Employment Security Law, and the minimum compensation shall be not less than twenty percent of such wage...
[5] AGREEMENT RE: General Motors advances for group disability benefits (sickness and accident benefits) covering a period or periods for which Workmen's Compensation benefits may later be paid.

In consideration of periodic advances paid to me for General Motors group disability benefits, I, the undersigned, for myself, my heirs, assignees, executors, administrators, or personal representatives, hereby assign and voluntarily agree to repay to my employer a sum equal to the lesser of the total of any weekly Workmen's Compensation benefits which may become due me for the period or periods that such advances were made either as the result of voluntary agreement or by award, or the total of such advances, it being my understanding that under the General Motors Insurance Program the scheduled amount of General Motors group disability benefits, for such period or periods, under Group Policy 15500 should be reduced by any weekly Workmen's Compensation benefits to which I may be entitled, and if such repayment is not made within sixty days after request is made by the Corporation for repayment thereof, the amount may be deducted by the Corporation from any wages thereafter payable to me.