761 So.2d 602 (2000)
Donald PACE
v.
CITY OF NEW ORLEANS.
No. 99-CA-1661.
Court of Appeal of Louisiana, Fourth Circuit.
April 19, 2000.
*603 William Ken Hawkins, Metairie, LA, Counsel for Plaintiff/Appellant.
(Court composed of Chief Judge ROBERT J. KLEES, Judge MIRIAM G. WALTZER, Judge DENNIS R. BAGNERIS, Sr.).
BAGNERIS, Judge.
Plaintiff/Appellant, Donald Pace ("Mr. Pace"), appeals the judgment of the Office of Workers' Compensation, whereby the Workers' Compensation Judge ("WCJ") found in favor of Defendant/Appellee, the City of New Orleans ("the City") and against Mr. Pace. The WCJ held that the City was entitled to an offset of disability benefits paid to Mr. Pace in the amount of $153.81, not the originally reduced value of $46.05, and that Mr. Pace was able to earn 90% of his pre-injury wage as of January 2, 1992. On appeal, Mr. Pace argues that the WCJ erred in calculating the disability pension offset, and in finding that he was able to earn 90% of his pre-injury wage as of January 2, 1992. For the reasons stated below, we affirm the ruling of the trial court.

FACTS AND PROCEDURAL HISTORY
The City of New Orleans hired Mr. Pace as a firefighter on April 3, 1973. On May 3, 1989, Mr. Pace began to experience chest pains when fighting a fire, which he reported to his employer. On May 7, 1989, Mr. Pace began experiencing chest pains once again. He was immediately rushed to Mercy Hospital where he was examined by Dr. Jack Ruli, an internal medicine physician, who confirmed that *604 Mr. Pace had sustained a heart attack. Dr. Ruli ordered an angiogram, which revealed damage to the front wall of Mr. Pace's heart.
On May 11, 1989, based upon the results of the angiogram, Mr. Pace underwent heart surgery consisting of a four-vessel coronary bypass. Dr. Ruli subsequently determined that Mr. Pace was suffering from significant ischemic heart disease. Accordingly, in February of 1990, Dr. Ruli advised the City that Mr. Pace was permanently disabled from performing his fire-fighting duties. On February 17, 1990, Mr. Pace was forced to leave the fire department, and he was awarded a disability pension.
At the time of his injury, Mr. Pace had an average weekly wage of $551.74. On November 3, 1991, the City exercised an offset based upon Mr. Pace's receipt of disability pension benefits, thereby reducing his weekly workers' compensation benefits from $267.00 to $46.05 per week. On February 10, 1997, after many fruitless requests to remove the offset, Mr. Pace filed suit against the City.
On May 13, 1998, the trial was held. At the conclusion of the claimant's portion of the trial, the WCJ recessed the trial. The trial was completed on September 28, 1998. In a judgment dated February 18, 1999, the WCJ found that the City was entitled to an offset of disability benefits from the time period of February 17, 1990 through January 2, 1992, in the amount of $153.81 per week, instead of the $46.05 per week that the City was currently paying. The WCJ further found that Mr. Pace was able to earn 90% of his pre-injury wages as of January 2, 1992. It is from this ruling that Mr. Pace now appeals.

DISCUSSION

Standard of Review
Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 (La.7/1/97), 696 So.2d 551; Smith v. Louisiana Dept. of Corrections, 93-1305 (La.2/28/94), 633 So.2d 129; Freeman v. Poulan/Weed Eater, 93-1530, (La.1/14/94), 630 So.2d 733. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the fact finder's conclusion was a reasonable one. Banks, supra; Freeman, supra; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Mart v. Hill, 505 So.2d 1120 (La.1987). Where there are two permissible views of the evidence, a fact finder's choice between them can never be manifestly erroneous or clearly wrong. Banks, supra; Stobart, supra. Thus, "if the [fact finder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." Banks, supra; Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106 (La.1990).

LAW AND DISCUSSION

I. THE TRIAL COURT DID NOT ERR IN CALCULATING THE DISABILITY PENSION OFFSET.
In the present case, Mr. Pace asserts that through May of 1989, he was a full-time employee of the New Orleans Fire Department and a part-time employee of the Fair Grounds as a ticket seller. On May 3, 1989, Mr. Pace suffered a debilitating heart attack that, upon the advice of his treating physician, ended his career as a fireman. On February 17, 1990, Mr. Pace began to receive disability payments of $1319.35 a month, or $213.21 a week, and workers' compensation benefits of $1068.00 a month, or $267.00 a week. On November 3, 1991, Mr. Pace's workers' compensation benefits were reduced from $267.00 per week to $46.05 per week. As a result, he filed suit against the City of New Orleans charging that the formula *605 used to calculate his reduction in his weekly workers' compensation benefits was improper as it did not comply with the jurisprudence of this State. We disagree.
LSA-R.S. 23:1021(10)(a)(i) provides in pertinent part:
"Wages" means average weekly wage at the time of the accident.
Hourly wages. If the employee is paid on an hourly basis and the employee is employed for forty hours or more, his hourly wage rate multiplied by the average actual hours worked in the four full weeks preceding the date of the accident or forty hours, whichever is greater.
The employer carries the burden of proving the amount of credit to which it is entitled under LSA-R.S. 23:1225 C(1). Matthews v. City of Alexandria, 619 So.2d 57 (La.1993). In calculating an offset, the trier of fact must (1) determine the claimant's average weekly wage ("AWW") and (2) determine the total remuneration from the workers' compensation benefits and the other identified benefits as set forth in LSA-R.S. 23:1225 C(1).
Specifically, LSA-R. S. 23:1225 C(1) provides the following:
If an employee receive remuneration from:
(a) Benefits under the Louisiana Workers' Compensation Law,
(b) Old-age insurance benefits received under Title II of the Social Security Act to the extent not funded by the employee
(c) Benefits under disability benefit plans in the proportion funded by an employer,
(d) Any other workers' compensation benefits, then compensation benefits under this Chapter shall be reduced, unless there is agreement to the contrary between the employee and the employer liable for payment of the workers' compensation benefit, so that the aggregate remuneration ... shall not exceed sixty-six and two-thirds percent of his average weekly wage.
In addition, any offset due to the employer under LSA-R.S. 23:1225 C(1) cannot reduce the employee's combined workers' compensation benefits and disability benefits below 66 2/3% of his AWW. Garrett v. Seventh Ward General Hospital, 95-0017, (La.9/22/95) 660 So.2d 841; Cousins v. City of New Orleans, 608 So.2d 978 (La.1992).
Mr. Pace claims that, based upon his 1988 income tax returns, at the time of his injury his AWW was $673.00. This figure included his part-time employment at the Fairgrounds. As a result, he asserts that his combined workers' compensation benefits and disability pension benefits should not fall below $448.69 per week.[1]
Mr. Pace initially received $213.21[2] a week in disability benefits funded by his employer, the City, and $267.00 in workers' compensation benefits a week for an aggregate remuneration of $480.21 a week. Since this figure exceeded two-thirds of his AWW, both the City and Mr. Pace recognized that the City was entitled to an additional offset.
Mr. Pace asserts that the additional offset should have only been $31.52, thereby reducing his weekly workers' compensation benefits from $267.00 to $235.48,[3] wherein his combined weekly disability benefits and workers' compensation benefits would total $448.69.[4] He contends that *606 because this amount is not less than two-thirds of his AWW, the offset is correct and appropriate. Although we agree with the manner in which Mr. Pace calculated his workers' compensation offset, we find that the figure he initially used as his AWW was incorrect, thus skewing the accuracy of his calculation.
We find, in accordance with the City's contentions, that at the time of his accident, Mr. Pace's AWW was $551.74[5] and not $673.00. Moreover, the City has properly introduced the check history of Mr. Pace for the four weeks prior to his heart attack pursuant to the requirements of LSA-R.S. 23:1021. These checks indicate an AWW of $514. 74.[6] Moreover, despite Mr. Pace's failure to show proof that he earned any state supplemental pay, the City assumed in fairness that he did, and has correctly it added it into his AWW. Conversely, Mr. Pace argues that this figure, $551.74, does not reflect his part-time employment at the Fairgrounds, and as a result is wrong. We disagree.
We find that Mr. Pace did not offer any objective proof of any additional earnings during the four-week period prior to his heart attack except what he earned as a full-time employee with the New Orleans Fire Department. Moreover, Mr. Pace testified at trial that his employment at the Fairgrounds ended in May of 1989, some two months before his heart attack. Therefore, according to the record, Mr. Pace did not earn any income other than what he was paid as a firefighter for the City in the four week period preceding his heart attack. Therefore, we find that the only wages that should have been used in calculating Mr. Pace's AWW are those that he earned as a full-time firefighter with the City.
Accordingly, we find that Mr. Pace's combined weekly disability benefits and workers' compensation benefits should not exceed $367.85.[7] Consequently, we find that the WCJ correctly calculated Mr. Pace's workers' compensation offset using the following formula:

$367.85 AWW
-214.04 Weekly Disability Pension Benefits
_______
$153.81 Weekly Workers' Compensation Benefits

We find that Mr. Pace's weekly workers' compensation benefits were improperly reduced from $267.00 to $46.05 on November 3, 1991. Likewise, we hold that proper offset reduction should have been $153.81. For these reasons, we affirm the decision of the WCJ.

II. THE TRIAL COURT DID NOT ERR IN FINDING THAT THE CLAIMANT WAS ABLE TO EARN 90% OF HIS PRE-INJURY WAGE AS OF JANUARY 2, 1992.

Supplemental Earnings Benefits
Entitlement to supplemental earnings benefits (SEB) is governed by LSA-R.S. 12:1221(3). In order to recover, a plaintiff must prove by a preponderance of the evidence that he is unable to earn wages equal to ninety percent (90%) or more of the wages he earned before the accident. The analysis is necessarily based on the facts and the circumstances where the court is mindful of the jurisprudential tenet that workers compensation law is to be liberally construed in favor of coverage. In determining if an injured employee has made a prima facie case of entitlement to SEB, the trial court may and should take into account all those factors which might bear on an employees ability to earn a wage. Once the employees burden is met, the burden of proof then shifts to the employer, who, if he wishes to contend that the employee is earning less than he is able to earn so as to defeat or reduce SEB, bears the burden of proving that the employee is physically able to perform a certain job and that the *607 job was offered to the employee or that the job was available to the employee in his or the employers community or reasonable geographic region. Smith v. Louisiana Dept. of Corrections, 93-1305, (La.2/28/94), 633 So.2d 129; Daigle v. Sherwin-Williams Co., 545 So.2d 1005, 1007 (La.1989). If the employer fails to meet this burden, then the SEB is calculated as a percentage of the difference between the wages earned pre-injury and the actual wages earned post-injury. Carter v. City of New Orleans Fire Dept., 94-0338, (La.App. 4 Cir. 11/17/94), 646 So.2d 455,460.
The facts presented in this case confirm that in 1988, Mr. Pace worked full-time for the New Orleans Fire Department and part-time at the Fairgrounds, earning a total income of $34,996.00 for that year. Mr. Pace testified that at the time of his heart attack in May of 1989, his job at the Fairgrounds had ended for the season. His primary employment at that time was with the Fire Department. In 1991, following heart surgery, Mr. Pace returned to work at the Fairgrounds, where he earned $580.13 that year. In November of 1991, his weekly workers compensation benefits were reduced from $267.00 to $46.05.
In 1992, Mr. Pace earned $2,864.90 working at the Fairgrounds. In 1993, Mr. Pace earned $2,308.88 working at the Fairgrounds and $1,741.69 at RPM Distributors delivering pizza. This resulted in a total annual income of $4,050.57 for 1993. In September of 1994, Mr. Pace became employed with the Times-Picayune Newspaper as an independent contractor, distributing newspapers. In 1994, Mr. Pace earned $1,820.29 working at the Fairgrounds, and he claims that he made $1,371.00 working for the Times Picayune, for a combined total income of $3191.29. Additionally, he claims that he earned $3,518.00 in 1995; $3,688.00 in 1996; and $4,458.00 in 1997 delivering papers for the Times Picayune.
Mr. Pace contends that the aforementioned figures clearly indicate that from May of 1989 through June of 1998 he was earning considerably less than 90% of his pre-injury wages. He insists that the trial court mistakenly issued a judgment stipulating that as of January 2, 1992, he was able to earn 90% of his pre-injury wages, when his reported income does not come near that requirement. Finally, Mr. Pace asserts that the City has failed to put forth any evidence to substantiate their allegations that he was falsifying his reported earnings and in fact making 90% of his pre-injury wage, as the IRS had not contested any of the earnings he reported on his tax form. We disagree. We suspect that the WCJ had the same apprehension as to the veracity of the income reported by Mr. Pace on his IRS report. Thus, we are not convinced that the figures Mr. Pace has brought before this Court clearly represent the extent of his income during his tenure with the Times Picayune.
First, Mr. Pace testified that in 1994 he bought approximately 700 papers at the wholesale price of $.37436 a piece and approximately 1300 papers at the wholesale price of $.90. At that time, the papers sold to the public for $.50 and $1.25, respectively. He testified that in 1995, he began purchasing the Sunday papers at a price of $1.10 when the suggested retail price of the papers rose to $1.50. He operated approximately 34 newspaper boxes. Mr. Pace further testified that the papers that he did not sell were returned to the Times Picayune, and the Times Picayune subsequently refunded the price he had paid for them. According to calculation done by the WCJ, Mr. Pace could have earned potentially $430.00 per week in 1994 and as much as $650.00 per week in 1994-1998, less a theft loss of approximately 15-20% a week. This would comprise an income of 90% of his pre-accident income.
Notwithstanding, when questioned as to the accuracy of these figures, Mr. Pace stated that he would be lucky if he cleared $250.00 a week after everything. However, Mr. Pace claimed on his IRS returns that he only made $3,500 in 1995. If Mr. *608 Pace earned $250.00 a week for fifty-two weeks, his potential earnings would reach almost $13,000. This Court finds that figure to be approximately four times more than the figure reported by Mr. Pace as his annual income that year. We find the inconsistencies in Mr. Paces IRS report to be quite disturbing. This leads us to doubt the truthfulness of Mr. Paces statements regarding his earnings during the course of his employment with the Times Picayune.
Next, we find that the testimony of Morris Schneider (Mr. Schneider), the Vice-President/Circulation Director for the Times Picayune, as to the amount of papers Mr. Pace purchased as an independent contractor, to be largely inconsistent with the purchase of inventory amount that Mr. Pace reported on his IRS statement in 1995-1997. Specifically, in 1995, Mr. Pace purchased 223,678 daily papers at $.37436 a piece and 79,252 Sunday papers at $1.10 a piece. Mr. Pace paid the Times Picayune a combined total of $170,913.30 in 1995 for papers; yet, he indicated on his tax return that his Cost of Goods Sold only amounted to $111,647. This figure is less than what he actually had to pay the Times Picayune that year. Therefore, it appears that Mr. Pace under-reported his Cost of Goods in 1995 on his tax return by $59,266.30.
In 1996, Mr. Pace once again purchased 214,830 daily papers at $.37436 a piece and 74,967 Sunday papers at $1.10 a piece, for a combined total of $162,887.46 paid to the Times Picayune that year. However, Mr. Pace claimed on his 1996 tax return that his Cost of Goods Sold for 1996 was $99,867.00. Once again, it appears that Mr. Pace under-reported the cost of his inventory by $63,020.46.
Finally, in 1997, Mr. Pace purchased 209,967 daily papers at $.37436 a piece and 73,938 Sunday papers at $1.10 a piece for a combined total of $159,935.04 paid to the Times Picayune that year. Notwithstanding, Mr. Pace claimed on his 1997 tax return that his Cost of Goods Sold for 1997 was $105,247. Yet again, it appears that Mr. Pace under-reported his Cost of Goods Sold in 1997 by $54,688.05.
Although we neither know nor understand what Mr. Pace's motive was for under-reporting his Cost of Goods Sold on his tax returns, this fact may have influenced the WCJ's credibility call about him. Thus, we find that the City has clearly demonstrated to us through the evidence presented that Mr. Pace has an ability to earn a substantial amount of money by selling Times Picayune newspapers. This amount is more than 90% of his pre-injury wage. Alternatively, we find that Mr. Pace has not proven an inability to earn 90% of his pre-injury wage as a result of his injury. For these reasons, we hold that the WCJ, who was in the best position to assess Mr. Paces demeanor and credibility during the course of the trial, did not err in holding that Mr. Pace was able to earn 90% of his pre-injury wages as January 2, 1992.

CONCLUSION
For the aforementioned reasons, we affirm the decision of the lower court.
AFFIRMED.
NOTES
[1] $673.00 × .6667 = $448.69.
[2] Monthly disability pension of $1319.00 × 12 months = $15,832.20/52 weeks = $304.46. If the City is entitled to an offset, but the Court finds no evidence of overall funding, then the percentage of the offset is 0%. However if the Court finds evidence of overall funding by the City, then the percentage of the offset is 70%. In this case, the City was entitled to a 70.03% offset. Therefore, $304.46 × 70.30% = $214.04.
[3] $480.21 - 448.69 = $31.52 and $267.00 - 31.52 = $235.48.
[4] $213.21 + 235.48 = $448.69.
[5] $2,103.00(firefighter salary) + $195.00(state supplemental pay) + $74.50 (uniforms) = $2,372.50/4.3 weeks = $551.74.
[6] Check on 4/8/89 - $975.29 + Check on 4/22-1083.66 = $2058.95/4 = $514.74.
[7] $551.74 (AWW) × .6667 = $367.85.