847 So.2d 6 (2003)
Alma M. JONES, Plaintiff-Appellant,
v.
GENERAL MOTORS CORPORATION, Defendant-Appellee.
No. 37,167-WCA.
Court of Appeal of Louisiana, Second Circuit.
April 9, 2003.
Opinion on Rehearing May 16, 2003.
*8 Alex S. Lyons, Counsel for Appellant.
Lunn, Irion, Salley, Carlisle & Gardner By: Walter S. Salley, J. Martin Lattier, Shreveport, Counsel for Appellee.
Before GASKINS, MOORE and KOSTELKA (Pro Tempore), JJ.
KOSTELKA, Judge Pro Tempore.
This appeal by claimant Alma Jones ("Jones") arises from a judgment awarding her temporary total disability benefits ("TTD") and supplemental earnings benefits ("SEB") but reducing the award by amounts paid under a disability plan. The employer, General Motors Corporation ("GM"), has answered the appeal and urges that the Workers' Compensation Judge ("WCJ") erred in awarding Jones additional benefits. We amend and affirm.

FACTS
Jones commenced employment with GM at its Shreveport truck assembly plant in 1983. She had various duties but primarily worked as a cab assembly machine operator *9 and described her work as "men's jobs ... hard jobs." In her deposition, Jones said that her job as an assembly machine operator required her to lift eight "light parts" and put them into the machine before the machine moved the parts to a robot.
GM had a policy requiring employees to report work-related injuries and between 1983 and 1999, Jones reported approximately thirty-nine different injuries. Among these injuries were some serious events including a neck and back injury and carpal tunnel syndrome. Jones also reported more minor events such as muscle strains. The more serious of her injuries restricted Jones from working with power tools and from lifting, bending and pushing.
On January 15, 1999, Jones, who is right handed, was working next to an assembly machine when a lever on the machine struck her right thumb. Orthopedic surgeon, Dr. John Knight ("Dr.Knight"), performed surgery on Jones' thumb which required partial amputation.
Jones thereafter received TTD benefits of $367.00 per week from February 1, 1999 through March 28, 1999, and permanent partial disability benefits from April 5, 1999 through May 21, 1999. She also received medical payments for reconstructive surgery for her thumb. Jones further sought and received Social Security disability benefits from February 1, 1999 through March 22, 2000.
In addition, Jones received payments from a sickness and accident policy entirely funded by GM. On January 25, 1999, Jones signed the following agreement:

REIMBURSEMENT AGREEMENT SICKNESS AND ACCIDENT AND EXTENDED DISABILITY BENEFITS
....
AGREEMENT RE: Sickness and Accident and Extended Disability Benefit payments covering a period or periods for which Workers Compensation may later be paid.
In consideration of Sickness and Accident and Extended Disability Benefits paid to me under the General Motors Life and Disability Benefits Program ("the Program"), and pursuant to the provisions of the Program, I, the undersigned, for myself, my heirs, assignees, executors, administrators, or personal representatives, hereby agree to repay to my employer a sum equal to the overpayment of Program benefits which is equal to the lesser of the total of any Workers Compensation benefits for loss of wages which becomes due me as the result of voluntary agreement or by award for the period or periods that such Sickness and Accident and Extended Disability Benefit payments were made, or the total of such Sickness and Accident and Extended Disability Benefit payments. I understand that under the General Motors Life and Disability Benefits Program, the scheduled amount of Sickness and Accident and Extended Disability Benefits, for such period or periods, should be reduced by any weekly Workers Compensation benefits to which I am entitled, and if such repayment is not made within sixty days after request is made by the Corporation for repayment thereof, the amount may be deducted, to the extent allowed by applicable law, by the Corporation from any amounts, including, but not limited to, wages thereafter payable to me.
....
Jones underwent a functional capacity evaluation ("FCE"). The lengthy evaluation concluded that Jones was capable of returning to light work (lifting ten pounds *10 frequently, twenty pounds occasionally, and negligible lifting constantly) so long as she was not required to perform with her right hand tasks requiring repetitive, forceful grasping, pinching, or fine fingering. The evaluator observed that Jones made good physical effort during the test but exhibited "at least some degree" of symptom magnification. With regard to symptom magnification, the evaluator stated:
In describing symptom magnification, I am by no means implying intent. Rather, I am simply stating that Ms. Jones can do more than she currently states or perceives. While her subjective reports should not be disregarded, they should be considered within the context of symptom magnification findings.
On March 24, 1999, Jones underwent an impairment and disability evaluation, and the evaluator concluded that she had a total impairment of her right thumb of 36 percent, which is equal to an 8 percent whole-person impairment.
Dr. Knight released Jones to return to work on March 29, 1999. The doctor's release specified:
Ms. Jones may return to her regular job. If this job is not available one must be found the (sic) fits within the restrictions outlined in the FCE.
Jones testified that she returned to the GM plant after her release to work sometime near the end of March, but "the plant doctor" told her that GM had no job which met her restrictions. Jones testified that from that point forward, GM did not pay her workers' compensation benefits, but instead paid her sickness and accident benefits under the GM-funded disability plan.
Although Dr. Knight's records reflect no complaints by Jones at her last visit, Jones testified that her hand was still swollen and hurting and that she did not like Dr. Knight's service because she believed he spent too little time evaluating and treating her problem and had released her too soon. She elected to see Dr. John Ferrell ("Dr.Ferrell"), another orthopedist, in April 1999. GM refused to pay for this additional evaluation and treatment. Dr. Ferrell's records reflect findings of painful and reduced motion in Jones' right thumb. His orders were for Jones to undergo three weeks of physical therapy and not to use her right hand. In late April, Dr. Ferrell maintained his order that Jones not use her right hand and indicated that she was to undergo partial nail removal surgery on May 12, 1999, which Dr. Ferrell performed.
On May 20, 1999, Dr. Ferrell again examined Jones and recommended that she undergo another FCE. His records indicate that he allowed Jones to return to work with limited use of her right hand and thumb on June 7, 1999. In the absence of a second FCE, Dr. Ferrell indicated that Jones' old FCE "... would be fairly similar to her restrictions at this point, as well as restrictions of pinching and pulling...." Dr. Ferrell executed a release for Jones to return to light work on that day. At a visit on July 30, 1999, Dr. Ferrell noted that "[W]e need to look at her old Functional Capacity Evaluation. She can't really grip or pinch with her right hand and can mainly do left hand dominant work." The doctor noted these restrictions in another report that day and also noted that the restrictions were permanent.
On July 28, 1999, Jones filed a disputed claim for compensation with the Office of Workers' Compensation ("OWC"). GM answered this claim and asserted its right to reimbursement or reduction of benefits per La. R.S. 23:1206 and La. R.S. 23:1225.
Jones was involved in an auto accident on September 4, 1999 that aggravated the *11 pain in her thumb. On September 23, 1999, Dr. Ferrell observed a bone spur in Jones' thumb that he was going to treat conservatively but which, he speculated, might require surgery. In October 1999, Dr. Ferrell again observed the bone spur and indicated that he felt the spur was causing Jones' pain and may need excision. He specified in his report of November 8, 1999 that Jones was permanently restricted from doing any "... real machine operating jobs, ..." but released her to return to work.
In December, 1999, Jones underwent a second FCE with Dr. William Fox ("Dr. Fox") who reported that the results of his grip test were invalid due to inappropriate findings indicating "... that the patient is not giving full effort." Dr. Fox wrote:
I feel that the only restriction she should have due to this injury would be no constant or frequent fine manipulation and dexterity but can occasionally (sic). She should not use (sic) of power tools.
On or about February 10, 2000, Jones returned to work at GM at the same job but under some restrictions. Jones testified that the lifting required in her job was too heavy for her and was outside of these restrictions and that she was again working with a machine. GM records reflect that Jones immediately reported difficulty doing her job and on February 14, 2000 called the plant doctor and said that she was going to have a nervous breakdown (Jones denied that she made any such statement). She testified that due to working under these conditions, she injured her back, shoulder and arm on February 15, 2000 and was forced to take sick leave again while she underwent therapy. She made a compensation claim for these injuries on February 26, 2002 as part of the instant case, but the WCJ found that this claim was filed too late. Jones did not appeal that ruling.
Because Jones had received Social Security disability payments in addition to disability payments under the GM plan, GM demanded repayment of overpayments.
In October 2001, Jones moved to Arlington, Texas, and commenced working for GM at its plant in that location. At trial, she testified that she works in various offices at the plant and that GM had not found a regular job for her to perform.
In her judgment, the WCJ ruled that:
Jones proved that she suffered a February 15, 2000 accident and injury but that her claim for compensation was filed too late and had prescribed;
Jones proved that she was temporarily totally disabled from March 29, 1999 through June 21, 1999 and was therefore awarded TTD benefits for that period;
Jones proved that she was unable to earn 90% of her pre-injury wages from June 22, 1999 through February 9, 2000 and was therefore awarded supplemental earnings benefits for this period;
GM was entitled to a dollar-for-dollar credit for sickness and accident benefits and extended disability benefits paid through February 9, 2000 excluding those amounts deducted from Jones' earnings as reimbursement;
Jones was not entitled to penalties and attorney fees because GM had not arbitrarily and capriciously terminated benefits for her thumb injury;
Jones was entitled to and awarded payment of Dr. Ferrell's medical treatment.
Jones now appeals only the dollar-for-dollar credit allowed for disability benefits paid, and GM appeals the award of additional compensation.

*12 DISCUSSION

Timeliness of the Appeal
Initially, we note an issue with the timeliness of this appeal that could potentially divest this Court of jurisdiction over the matter. The judgment appealed from was signed by WCJ Rosa Whitlock on June 28, 2002. That same day, the OWC sent notice of judgment to the parties' attorneys. Jones filed her motion for appeal on September 6, 2002.
Louisiana R.S. 23:1310.5(B) provides:
The decision of the workers' compensation judge shall be final unless an appeal is made to the appropriate circuit court of appeal. An appeal which suspends the effect or execution of an appealable judgment or order must be filed within thirty days. An appeal which does not suspend the effect or execution of an appealable judgment or order must be filed within sixty days. The delay for filing an appeal commences to run on the day after the judgment was signed or on the day after the district office has mailed the notice of judgment as required by Louisiana Code of Civil Procedure Article 1913, whichever is later. Motions for new trial shall be entertained in disputes filed under this Chapter.
This provision explicitly specifies that the delay for filing an appeal commences on the day after the mailing of the notice of judgment. Reading the rule strictly, Jones had sixty days from June 28, 2002 to file her motion for appeal, and thus her September 6, 2002 motion would not be timely. This provision is different from the usual provision for ordinary civil cases found in La. C.C.P. art.2087, which provides, in part:
A. Except as otherwise provided in this Article or by other law, an appeal which does not suspend the effect or the execution of an appealable order or judgment may be taken within sixty days of any of the following:
(1) The expiration of the delay for applying for a new trial or judgment notwithstanding the verdict, as provided by Article 1974 and Article 1811, if no application has been filed timely.
(2) The date of the mailing of notice of the court's refusal to grant a timely application for a new trial or judgment notwithstanding the verdict, as provided under Article 1914.
The workers' compensation rule does not explicitly make an allowance for any delay caused by the filing of a motion for new trial, whereas the ordinary civil rule takes this delay into account. Notably, the workers' compensation rule was amended in 2001 and for the first time allows motions for new trial; the prior rule disallowed such motions.
Because the compensation statutes do not specify the procedure for a motion for new trial, Section 6601 of the Compensation Hearing Rules applies. This rule provides that "any practice or procedure not in conflict with either the Workers' Compensation Act or these rules will be guided by practice and procedure provided for in the Louisiana Code of Civil Procedure."
Louisiana C.C.P. art.1974 provides:
The delay for applying for a new trial shall be seven days, exclusive of legal holidays. The delay for applying for a new trial commences to run on the day after the clerk has mailed, or the sheriff has served, the notice of judgment as required by Article 1913.
In Girard v. Courtyard by Marriott, 02-105 (La.App. 3rd Cir.03/27/02), 813 So.2d 595, the workers' compensation rule was interpreted so as to make its application identical to the analogous rules of civil procedure. It was held that the delay for *13 filing a motion for appeal did not commence until the delay for applying for a new trial expired. We agree with that reasoning and adopt this interpretation of the rule.
June 28, 2002 was a Friday. The time for filing a motion for new trial commenced on Monday, July 1, due to the intervening weekend. Thursday, July 4, was a holiday, and excluding the following weekend, the period for filing a motion for new trial ended on Wednesday, July 10. The delay for taking an appeal under the Girard interpretation commenced the next day, July 11, 2002, and sixty days from that day (including holidays) ended on September 11, 2002. Including the new trial delay in the computation, the September 6, 2002 motion for appeal was timely. Accordingly, this Court will now consider the merits of this appeal.
"Dollar-For-Dollar" Credit Against Compensation For Benefits Paid
In her only assignment of error, Jones urges that GM was not entitled to a dollar-for-dollar credit for sums paid her under GM's disability plan. Specifically, Jones asserts that La. R.S. 23:1225 does not allow an offset greater than 66 2/3 percent of the injured workers' weekly wage and that amendments to the statute have legislatively overruled this Court's decision to the contrary in Hughes v. General Motors Guide Lamp Division, 469 So.2d 369 (La. App. 2d Cir.1985).
As noted above, GM had demanded and is apparently receiving payment from Jones for overpayments of sickness and accident benefits under its insurance plan because Jones received Social Security disability payments. That reimbursement is not at issue here. Instead, the credit at issue concerns the WCJ's additional award of compensation benefits from March 29, 1999 through February 9, 2000. In other words, the issue is GM's right to a credit for the sickness and accident benefits paid against the additional workers' compensation benefits awarded by the WCJ.
When an employee receives, in addition to workers' compensation benefits, the benefits under another (non-workers' compensation) disability plan funded by the employer, the employer is entitled to a credit for the benefits received by the employee from the separate disability plan. Feild v. General Motors, 36,339 (La. App.2d Cir.09/18/02), 828 So.2d 150. The employer has the burden of proving both its entitlement to and the amount of this credit. Id.
Louisiana R.S. 23:1225 provides, in part:
C. (1) If an employee receives remuneration from:
(a) Benefits under the Louisiana Workers' Compensation Law.
(b) Old-age insurance benefits received under Title II of the Social Security Act to the extent not funded by the employee.
(c) Benefits under disability benefit plans in the proportion funded by an employer.
(d) Any other workers' compensation benefits,
then compensation benefits under this Chapter shall be reduced, unless there is an agreement to the contrary between the employee and the employer liable for payment of the workers compensation benefit, so that the aggregate remuneration from Subparagraphs (a) through (d) of this Paragraph shall not exceed sixty-six and two-thirds percent of his average weekly wage.
....
(3) If an employee is receiving both workers' compensation benefits and disability benefits subject to a plan providing for reduction of disability benefits, *14 the reduction of workers' compensation benefits required by Paragraph (1) of this Subsection shall be made by taking into account the full amount of employer funded disability benefits, pursuant to plan provisions, before any reduction of disability benefits are made.
(4) If a conflict arises between the application of the provisions of this Section and those of any other Louisiana law or contract of insurance, the provisions of this Section shall control.
....
(Emphasis added.)
Jones urges that the rule does not allow reduction of her compensation benefits beyond a 66 2/3 percent floor. However, La. R.S. 23:1225(C)(3) specifically allows for, and indeed requires, a reduction of compensation benefits for the full amount of employer funded disability benefits pursuant to plan provisions. The WCJ did not err in awarding GM this credit. Feild, supra.
The portion of the judgment concerning reimbursement was made in accordance with the law and with the reimbursement agreement under the GM benefits plan.
Entitlement to Further Benefits.
In its answer, GM appeals the award of additional compensation benefits to Jones as a result of the accident involving her thumb. The additional awards were for TTD through June 21, 1999 and SEB from June 22, 1999 through February 9, 2000.
With regard to TTD, La. R.S. 23:1221 provides, in part:
(1)(c) For purposes of Subparagraph (1)(a) of this Paragraph, whenever the employee is not engaged in any employment or self-employment as described in Subparagraph (1)(b) of this Paragraph, compensation for temporary total disability shall be awarded only if the employee proves by clear and convincing evidence, unaided by any presumption of disability, that the employee is physically unable to engage in any employment or self-employment, regardless of the nature or character of the employment or self-employment, including but not limited to any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment.
With regard to SEB, this court in Lee v. Schumpert, 36,733 (La.App.2d Cir.01/29/03), 836 So.2d 1214, explained:
A claimant is entitled to receive supplemental earnings benefits if she sustains a work-related injury that results in her inability to earn 90% or more of her average pre-injury wage. The claimant bears the initial burden of proving, by a preponderance of the evidence, that the injury resulted in the inability to earn that amount, under the facts and circumstances of the case. If the claimant meets this burden, the burden shifts to the employer to prove that the claimant is physically able to perform a certain job and that the job was offered to the claimant, or that the job was available to her within her or the employer's geographic region. If the employer satisfied that burden, then the claimant must show, by clear and convincing evidence unaided by any presumption of disability, that she is unable to perform the employment offered or available, solely as a result of substantial pain. The WCJ's factual findings cannot be reversed unless they are plainly wrong. (Cites omitted.)
Factual findings in workers' compensation cases are subject to the manifest error or clearly wrong standard of appellate review. Seal v. Gaylord Container Corp., 97-0688 (La.12/02/97), 704 So.2d *15 1161; Banks v. Industrial Roofing & Sheet Metal Works, 96-2840 (La.07/01/97), 696 So.2d 551. In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the fact-finder's conclusion was a reasonable one. Id. If the fact-finder's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Seal, supra.
Although GM has shown by copious medical evidence that Jones made a large number of work-related injury complaints during her long tenure at the Shreveport plant, we do not believe that this evidence is sufficient to undermine the WCJ's decision to credit Jones' testimony that she was disabled due to her injury. The medical records pertinent to the thumb injury, particularly those of Dr. Ferrell, are sufficient support for the conclusion that Jones was unable to work until June 7, 1999, when Dr. Ferrell released her to light-duty work. The WCJ found that Jones was unable to work until June 21, 1999 and awarded benefits accordingly. Likewise, the WCJ's award of medical expenses for Dr. Ferrell's treatment is supported by the same evidence. However, there is no support in the record for a finding of Jones' inability to work after June 7, 1999, and the judgment of the WCJ is hereby amended to award TTD benefits only until June 7, 1999.
Regarding the award of SEB, we believe that Jones' personnel file and her medical records provide sufficient support for the WCJ's conclusion that Jones was entitled to these benefits until her return to work. Payroll records show that Jones earned an average weekly wage of $1,166.40 for the four weeks actually worked prior to her thumb injury. Jones' medical records show that she continued to have pain and difficulty with her hand during the period after June 7, 1999, and by July 30, 1999, Dr. Ferrell had made her right hand restrictions permanent. Moreover, there is nothing in the record to suggest that Jones could perform other employment outside of GM that would allow her to earn 90 percent of her pre-accident wages. This is sufficient proof to shift the burden to the employer. Compare Allen v. City of Shreveport, 618 So.2d 386 (La.1993).
GM failed to prove that Jones' job as an assembly machine operator or equivalent was available until February 10, 2000. GM's records do not show that the employer made a concerted effort to place Jones in a job that she could perform and suggest that no suitable job was available.
Because of the error pertaining to TTD benefits, the SEB award must be extended to begin on June 8, 1999. We believe that the WCJ correctly terminated benefits on February 9, 2000 when Jones actually returned to work.

CONCLUSION
The judgment of the WCJ is hereby amended to award Jones temporary total disability benefits from March 29, 1999 through June 7, 1999 and supplemental earnings benefits from June 8, 1999 through February 9, 2000. In all other respects, the judgment is affirmed. Costs of this appeal are assessed equally to Alma Jones and General Motors.
AFFIRMED, AS AMENDED.
Before BROWN, STEWART, GASKINS, MOORE and KOSTELKA (Pro Tempore), JJ.

ON REHEARING
PER CURIAM.
On application of Alma Jones ("Jones") for rehearing, this Court now clarifies its *16 reasons for holding that General Motors Corporation ("GM") is entitled to take a dollar-for-dollar credit against compensation amounts paid under its disability plan.
In its original opinion, this Court relied on La. R.S. 23:1225(C)(3) as authority to uphold the GM reimbursement agreement. Upon further consideration, we find that this portion of the statute is inapplicable to this controversy but is instead designed to allocate the offset to the compensation insurer where both the insurer and a disability plan seek to employ the offset.
The question presented by this case is whether an employer may enforce a reimbursement agreement when that agreement causes the worker's recovery of benefits from multiple sources to go below 66 2/3 percent of the worker's average weekly wage.
In Hughes v. General Motors, 469 So.2d 369 (La.App. 2d Cir.1985), this Court enforced a nearly identical reimbursement agreement and allowed the employer to take a dollar-for-dollar credit against workers' compensation for sums paid under an employer-funded group disability plan. The version of La. R.S. 23:1225 that would have applied in Hughes did not include employer-funded disability benefit plans as an item to be offset, and this Court did not consider the application of this statute. More recently, this Court has considered the offset but not in the context of a specific reimbursement agreement. See, e.g., Feild v. General Motors, 36,339 (La.App.2d Cir.09/18/02), 828 So.2d 150; Bank of Winnfield and Trust Co. v. Collins, 31,473 (La.App.2d Cir.02/24/99), 736 So.2d 263; Holden v. International Paper Company, 31,104 (La.App.2d Cir.10/28/98), 720 So.2d 442, writ denied, 1998-2956 (La.01/29/99), 736 So.2d 834 and G.N.B. v. Jones, 29,779 (La.App.2d Cir.08/20/97), 699 So.2d 466.
La. R.S. 23:1225(C)(1) specifies in part that when a worker receives benefits from more than one listed source, compensation benefits shall be reduced "unless there is an agreement to the contrary between the employee and the employer liable for payment of the workers' compensation benefit, so that the aggregate remuneration from Subparagraphs (a) through (d) of this Paragraph shall not exceed sixty-six and two-thirds percent of his average weekly wage."
In the instant case, the employer and employee have agreed that the employee must repay disability program benefits to the full extent that the employee is entitled to compensation benefits and not just to the extent that the aggregate exceeds the statutory cap.
We believe that by the addition of La. R.S. 23:1225(C)(1)(c), the legislature intended to broaden the scope of the benefit coordination scheme. The purpose of the scheme is to ensure that an employee experiencing only one wage loss receives only one wage loss benefit from the employer. Wal-Mart Stores, Inc. v. Keel, XXXX-XXXX (La.04/03/02), 817 So.2d 1. See also, Al Johnson Const. Co. v. Pitre, 98-2564 (La.05/18/99), 734 So.2d 623. To that end, the legislature specified that a worker may not receive more than 66 2/3 percent of his average weekly wage from the combination of the specified sources of benefits.
Jones argues that the reimbursement agreement is against public policy and unenforceable because it reduces her aggregate remuneration below 66 2/3 percent of her average weekly wage. See also, La. R.S. 23:1225(C)(4). However, the statute does not specify that the aggregate remuneration to the worker must be equal to 66 2/3 percent of the worker's average weekly wage; instead, it prohibits remuneration exceeding that amount in the *17 absence of an agreement to the contrary. The statute does not explicitly place a lower limit on the amount of compensation benefits that must be awarded; other statutes establish that amount. Instead, the statute places a cap on the remuneration to the worker that may be varied by agreement. Accordingly, the reimbursement agreement does not violate public policy and is thus enforceable.
Jones further contends that the reimbursement agreement is unenforceable due to Great-West Life Annuity Insurance Company v. Knudson, 534 U.S. 204, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002). In Great West, the supreme court concluded that ERISA allowed a benefit plan only to seek equitable relief, and thus the plan could not bring an action for money damages against the beneficiary.
In Martco Partnership v. Lincoln National Life Insurance Company, 86 F.3d 459 (5th Cir.1996), the court concluded that La. R.S. 23:1225(A) and (C)(1)(c) are not preempted by ERISA. Because we find that the reimbursement agreement is authorized by and enforceable under Louisiana workers' compensation law, the Workers' Compensation Judge ("WCJ") may enforce the agreement by reducing GM's compensation obligation. In the instant case, GM is attempting to enforce its rights with regard to its compensation obligation and is not seeking a money judgment in favor of the disability plan.
In all other respects, this Court's original opinion is maintained.