871 So.2d 1109 (2004)
Alma M. JONES
v.
GENERAL MOTORS CORPORATION.
No. 2003-C-1766.
Supreme Court of Louisiana.
April 30, 2004.
Rehearing Denied June 25, 2004.
*1110 Alexander S. Lyons, Shreveport, for applicant.
Lunn, Irion, Johnson, Salley & Carlisle, Joseph M. Lattier, for respondent.
WEIMER, Justice.
This matter is before the court on the limited issue of whether this employer is entitled to a credit against its workers' *1111 compensation obligations pursuant to a purported reimbursement agreement executed by an injured employee.
The judgment rendered by the workers' compensation judge awarded the employee workers' compensation benefits subject to a credit to the employer for payment of sickness and accident benefits. For reasons that follow, we find the agreement is unenforceable, and the employer is not entitled to a credit.

FACTS AND PROCEDURAL HISTORY
In 1983, Alma M. Jones began employment with General Motors Corporation (GM) at an assembly plant in Shreveport, Louisiana. During the course of her employment, she sustained a work-related injury on January 15, 1999, when a lever on the assembly machine she operated suddenly struck her right thumb severing the tip of the thumb. The injury required a partial amputation of the thumb and resulted in a total impairment of the thumb of 36 percent, the equivalent of an 8 percent whole-person impairment.
Dr. John Knight, the orthopedic surgeon who performed the partial amputation, released Jones to return to light duty work on March 29, 1999. The physician indicated that if the job she was performing at the time of injury was not available, a job must be found within the restrictions outlined in the functional capacity evaluation. Because her former job was unavailable and there were no jobs available within the set restrictions, GM discontinued the workers' compensation benefits for temporary total disability it had been paying and began paying Jones workers' compensation benefits for permanent partial disability until May 21, 1999, at which time all workers' compensation benefits were terminated.[1]
On July 28, 1999, Jones filed a disputed claim for workers' compensation benefits, penalties and attorney fees. GM answered, denying that claimant was entitled to any additional workers' compensation benefits or medical expense reimbursement beyond what had already been paid; GM also asserted all rights to reduce benefits pursuant to LSA-R.S. 23:1206 and LSA-R.S. 23:1225, rights to credits or offsets set forth in LSA-R.S. 23:1221(3), rights to deny or reduce payments for medical expenses pursuant to LSA-R.S. 23:1142, and credit for medical expenses pursuant to LSA-R.S. 23:1212.
At the trial of this matter, three documents that relate to the issue involved in this matter were introduced into evidence.
A joint exhibit, J-2, showed the workers' compensation benefits GM paid to Jones following her accident on January 15, 1999. GM paid Jones temporary total disability benefits of $367.00 per week from February 1, 1999, through March 28, 1999, and permanent partial disability benefits of $367.00 per week thereafter through May 21, 1999.
GM introduced into evidence, as exhibit D-4, a so-called "Reimbursement Agreement" that was signed by Jones on January 25, 1999, nine days following her accident and prior to her receipt of any wageloss benefits. The Reimbursement Agreement concerns her purported consent to repayment of workers' compensation benefits or sickness and accident and extended disability benefits (sickness/accident benefits) paid by the General Motors Life and *1112 Disability Benefits Program (Benefits Program), which is totally funded by GM. The Reimbursement Agreement is the basis for GM's claim to a credit toward any obligation to Jones for workers' compensation benefits for the thumb injury subsequent to May 21, 1999. (The text of the Reimbursement Agreement is reproduced, infra.)
Jones introduced into evidence an undated letter to her from GM (exhibit P-16), in which GM set out the amounts and dates of its payments to Jones pursuant to the Benefits Program. The letter shows that, in addition to the workers' compensation benefits evidenced in J-2, Jones received sickness/accident benefits of $123.00 per week for the period from February 1, 1999, through March 28, 1999, sickness/accident benefits of $490.00 per week for the period from March 29, 1999, through January 14, 2000, and extended disability benefits that totaled $1,670.23 for the period of January 15, 2000, through February 9, 2000.
GM's total payment of sickness/accident benefits pursuant to the Benefits Program for the thumb injury from February 1, 1999, through February 9, 2000, was $23,234.23.[2] According to exhibit P-16, GM claimed that amount included a "gross overpayment" of sickness/accident benefits from February 1, 1999, through February 9, 2000, of $13,613.90.[3] GM calculated the overpayment on the basis of Jones's receipt during that time period of Social Security disability benefits of $1,189.00 per month, plus two cost-of-living increases. The letter states the gross overpayment represents the weekly Social Security disability benefits "carveout amount" that should have been deducted from the employee's weekly sickness/accident benefits. Pursuant to exhibit P-16, GM began making regular salary deductions of $50.00 per week, which amounted to a total in excess of $3,000.00 by the time of trial.
Following trial on the merits, the workers' compensation judge (WCJ) ruled that Jones was entitled to workers' compensation benefits for temporary total disability from March 29, 1999, through June 21, 1999, based on an average weekly wage of $1,166.40 and a maximum weekly compensation rate of $367.00. LSA-R.S. 23:1221(1); LSA-R.S. 23:1202.[4] The WCJ *1113 also ruled that Jones was also entitled to supplemental earnings benefits from June 22, 1999, through February 9, 2000, based on the same wage and maximum compensation rate, with a zero earning capacity for such period. LSA-R.S. 23:1221(3).[5]
The WCJ granted GM a dollar-for-dollar credit for sickness/accident benefits paid through February 9, 2000, excluding amounts deducted from Jones's earnings by defendant as reimbursement for overpayment of benefits to her. The "amounts" from "earnings" referred to in the judgment were evidenced by the letter from GM to Jones, which was introduced into evidence as exhibit P-16.[6]
Both parties appealed. Jones assigned error to the ruling that GM was entitled to the dollar-for-dollar credit. GM appealed the award of additional compensation benefits.[7]
Except for a minor amendment, the *1114 court of appeal affirmed the judgment.[8]Jones v. General Motors Corporation, 37,167 (La.App. 2 Cir. 4/9/03), 847 So.2d 6. Jones filed a motion for rehearing, arguing that the court of appeal incorrectly interpreted the statutory scheme for offsets established by the legislature in LSA-R.S. 23:1225(C)(1).[9]
On rehearing, in a per curiam opinion, the court clarified its reasons for holding that GM was entitled to take a dollar-fordollar credit for amounts paid under the Benefits Program. The court considered the question of whether an employer may enforce a reimbursement agreement when that agreement causes the worker's recovery of benefits from multiple sources to go below 66 2/3 percent of the worker's average weekly wage. Jones, 37,167 at 1, 847 So.2d at 16. The court of appeal acknowledged that the original opinion relied on the statutory provision of LSA-R.S. 23:1225(C)(3)[10] to uphold the Reimbursement Agreement. On further consideration, the court of appeal found that statutory provision to be inapplicable to the current controversy.[11]
The court then analyzed the Reimbursement Agreement under the provisions of LSA-R.S. 23:1225(C)(1)(c). Considering the language of that section of the statute, the court concluded: (1) the employee was not entitled to aggregate remuneration from multiple sources which exceeded 66 2/3 percent of the average weekly wage; (2) the statute does not place a lower limit on the amount of workers' compensation benefits that must be awarded, which minimum is established by other statutes; and (3) the statutory cap of 66 2/3 percent may be varied by agreement. The court found that the Reimbursement Agreement between the parties did not violate public policy and was thus enforceable. All other aspects of the original opinion were maintained.[12]
Jones applied for writ of certiorari, which this court granted to review the propriety of the ruling. Jones v. General Motors Corporation, 03-1766 (La.11/7/03), 857 So.2d 506.

*1115 DISCUSSION
Workers' compensation is only one part of an employer-based system of wage-loss protection. The overall system of benefits by which employers provide their employees with protection against loss of wages includes unemployment compensation, nonoccupational sickness and disability insurance, and old age and survivors' insurance. Garrett v. Seventh Ward General Hospital, 95-0017, p. 3 (La.9/22/95), 660 So.2d 841, 843, citing 4 ARTHUR LARSON, WORKER'S COMPENSATION § 97.10 (1995).
In the instant case, GM provided its employees with the Benefits Program and argues it is entitled to recover an amount equal to the total of sickness/accident benefits paid to Jones based upon the Reimbursement Agreement executed by her pursuant to that program. In its postargument brief to this court, GM contends the statutory authority applied by the court of appeal, LSA-R.S. 23:1225(C)(1), has no relevance to the disposition of the issue of GM's entitlement to a 100 percent dollar-for-dollar credit for sickness/accident benefits paid against any workers' compensation benefits due Jones for the same time period. GM alternatively contends LSA-R.S. 23:1206, which provides for deductions from workers' compensation benefits for voluntary payments, is controlling. GM relies on the language of Section 1206 ("Any voluntary payment ... by the employer ... to the employee ... which [was] not due and payable when made, may be deducted from the payments to be made as compensation.") and the decision of the second circuit in Hughes v. General Motors Guide Lamp Division, 469 So.2d 369 (La.App. 2 Cir.1985). GM contends these authorities entitle GM to a 100 percent dollar-for-dollar credit for sickness/accident benefits paid against any workers' compensation benefits due Jones for the same time period.[13]
The Louisiana Workers' Compensation Law, LSA-R.S. 23:1021 et seq. contains a provision for wage-loss benefits coordination in LSA-R.S.23:1225. Wageloss benefit coordination legislation within the overall scheme of the Louisiana Workers' Compensation Law is designed for a dual purpose: first, to assure, when an employee suffers a wage loss because of disability, that a certain minimum portion of the employee's actual wages is continued; and second, to preclude an employee from contemporaneously collecting duplicative wage-loss benefits under different parts of the overall system of employerbased protection against loss of wages. The underlying concept is that an employee cannot recover more than the amount of his or her actual wages. Garrett, 95-0017 at 3-4, 660 So.2d at 843. Receiving more than one's wages without working would be an impermissible disincentive to productivity, which the law does not sanction.
In 1983, the legislature passed a comprehensive coordination of benefits *1116 scheme, restricting payment of some benefits[14] and stating aggregate remuneration shall not exceed sixty-six and two-thirds of average weekly wages with respect to other coordinated benefits listed. The legislation included the statutory provision at issue in the instant case, LSA-R.S. 23:1225(C)(1), which provides in pertinent part:
C. (1) If an employee receives remuneration from:
(a) Benefits under the Louisiana Workers' Compensation Law.
....
(c) Benefits under disability benefit plans in the proportion funded by an employer.
(d) Any other workers compensation benefits, then compensation benefits under this Chapter shall be reduced, unless there is an agreement to the contrary between the employee and the employer liable for payment of the workers' compensation benefit, so that the aggregate remuneration from subparagraphs (a) through (d) of this Paragraph shall not exceed sixty-six and two-thirds percent of his average weekly wage. (Underlining supplied.)[[15]]
Thus, if the total remuneration contemplated in Section 1225(C)(1) exceeds 66 2/3 percent of a worker's average weekly wage, the employer is allowed to reduce its workers' compensation obligation in an amount equal to the excess benefits. The jurisprudence has held that the benefits can only be reduced to the level of 66 2/3 percent of the average weekly wage. This court held in Garrett, 95-0017 at 13, 660 So.2d at 848 (overruled on other grounds in Al Johnson Construction Company v. Pitre, 98-2564, p. 10, (La.5/18/99), 734 So.2d 623, 628), the employee's aggregate remuneration could not go below 66 2/3 percent of the average weekly wage. Following this concept, courts of appeal have held that the offset of Section 1225(C)(1) cannot reduce the injured worker's combined benefits below 66 2/3 percent of average weekly wages. See, e.g., Fontenot v. Trans Gulf, Inc., 95-0342, p. 18 (La.App. 1 Cir. 11/9/95), 664 So.2d 1238, 1250; G.N.B., Inc. v. Jones, 29,779, p. 7 (La.App. 2 Cir. 8/20/97), 699 So.2d 466, 470; Pace v. City *1117 of New Orleans, 99-1661, p. 5 (La.App. 4 Cir. 4/19/00), 761 So.2d 602, 605.
However, GM argues that it is entitled to recover an amount equal to the total of sickness/accident benefits paid to Jones pursuant to the Benefits Program because its Reimbursement Agreement is an "agreement to the contrary" permitted by Section 1225(C)(1). The crux of GM's argument centers on the applicability of the Reimbursement Agreement presented to Jones by GM for her signature. The agreement provides as follows:
AGREEMENT RE: Sickness and Accident and Extended Disability Benefit payments covering a period or periods for which Workers Compensation may later be paid.
In consideration of Sickness and Accident and Extended Disability Benefits paid to me under the General Motors Life and Disability Benefits Program ("the Program"), and pursuant to the provisions of the Program, I, the undersigned, for myself, my heirs, assignees, executors, administrators, or personal representatives, hereby agree to repay to my employer a sum equal to the overpayment of Program benefits which is equal to the lesser of the total of any Workers Compensation benefits for loss of wages which becomes due me as the result of voluntary agreement or by award for the period or periods that such Sickness and Accident and Extended Disability Benefit payments were made, or the total of such Sickness and Accident and Extended Disability Benefit payments. I understand that under the General Motors Life and Disability Benefits Program, the scheduled amount of Sickness and Accident and Extended Disability Benefits, for such period or periods, should be reduced by any weekly Workers Compensation benefits to which I am entitled, and if such repayment is not made within sixty days after request is made by the Corporation for repayment thereof, the amount may be deducted, to the extent allowed by applicable law, by the Corporation from any amounts, including, but not limited to, wages thereafter payable to me.
Despite the fact that the first sentence states Jones's obligation under the Reimbursement Agreement is "pursuant to the provisions of the Program" and the second sentence states that "under the ... Program" a reduction of sickness/accident benefits is called for, GM did not introduce the Benefits Program provisions into evidence at the trial of this matter. As such, essential evidence is not available for this court's review in evaluating the Reimbursement Agreement.
Section 1225(C)(1), which authorizes a reduction of the workers' compensation obligation when the employee receives other enumerated benefits, is a restriction on an injured employee's right to workers' compensation benefits and must be strictly construed. Cousins v. City of New Orleans, 608 So.2d 978, 981 (La.1992). An employer seeking credit for benefits covered by the statute has the burden of proving both entitlement to and the amount of the credit. Matthews v. City of Alexandria, 619 So.2d 57, 60 (La. 1993). GM is claiming a credit against its workers' compensation obligation; therefore, GM has the burden of proving the amount of the credit to be applied. Without the pertinent provision(s) of the Benefits Program in evidence, this court has no choice but to find that GM failed to meet its burden of proof. Thus, we can only evaluate Jones's obligations pursuant to the language within the four corners of the *1118 Reimbursement Agreement.[16]
Contracts between employers and employees concerning wage-loss benefits are not prohibited. Louisiana Revised Statutes 23:1225(C)(1)(d) specifically mentions an "agreement ... between the employee and the employer." However, an agreement which waives or alters statutorily established rights must be "clear and unambiguous." See, e.g., Prince v. Paretti Pontiac Company, Inc., 281 So.2d 112, 117 (La.1973). This is particularly so in the workers' compensation arena which is designed to benefit the injured worker. See also, LSA-R.S. 23:1033 which imposes a limitation on a contract which relieves the employer of compensation liability.[17] The agreement must clearly evidence the intent of the parties. See Green v. New Orleans Saints, 00-795 (La.11/13/00), 781 So.2d 1199, where this court held the agreement between the parties did not waive the team's statutory entitlement to an offset.
The Reimbursement Agreement is written in convoluted, confusing double-speak, as if designed to prevent ease of understanding. It is so poorly drafted as to be all but unintelligible. The words "equal to" appear twice within 8 words of one another in the first sentence, which consists of 122 words. When the two sentences of the Reimbursement Agreement are stripped of excess verbiage, the second sentence may contradict the first. Untold judicial time has been consumed in an attempt to comprehend and give meaning to this document to no avail.
The first full sentence of the Reimbursement Agreement, although far from clear, apparently obligates Jones to repay the lesser of two amounts: 1) sickness/accident benefits paid to her or 2) payments of GM's total workers' compensation liability. Apparently, the Reimbursement Agreement contemplates a simultaneous payment by GM to Jones of sickness/accident benefits and workers' compensation benefits. Because of this agreement, GM claims it is due a dollar-for-dollar credit[18] for the payments made pursuant to the Benefits Program against the amount of workers' compensation it has been ordered to pay.
We hold the agreement as written, without proof of the contents of a Benefits Program provision authorizing such reimbursement, is unenforceable. In the absence of an "agreement to the contrary," workers' compensation benefits received by an employee can only be reduced when the aggregate remuneration from the listed *1119 benefit sources in Section 1225(C)(1) exceeds 66 2/3 percent of the average weekly wage. If the aggregate remuneration received by the employee is equal to or less than 66 2/3 percent of the average weekly wage, no adjustment to the workers' compensation benefits would occur.[19]
The record presented for our review contains unrefuted evidence (exhibit P-16) that GM made, and continues to make, payroll deductions which must be factored into the calculation in order to determine the amount of sickness/accident benefits actually received by Jones that will in turn be added to the workers' compensation benefits to determine whether the amount received from multiple benefit sources exceeds 66 2/3 percent of her average weekly wage.[20]
The amounts of the sickness/accident benefits paid, the lesser amounts GM calculated the Program should have paid (due to the Social Security disability benefits Jones received), and the resulting overpayment that GM demanded Jones repay (through salary deductions) were tabulated in exhibit P-16 in various time segments. For example, from March 29, 1999, through July 11, 1999, the Program paid weekly sickness/accident benefits of $490.00, but claimed it should have paid only $215.40 because Jones received Social Security disability benefits during that time period. The difference, according to GM, was added to the "total overpaid" to form the aggregate amount that eventually would be deducted from Jones's wages.
Because of the payroll deductions, GM effectively paid $215.40 per week in sickness/accident *1120 benefits and owes $367.00 per week in workers' compensation benefits or supplemental earnings benefits from May 22, 1999, to February 9, 2000.
We have separated the time span of Jones's disability into segments and determined that Jones's weekly aggregate remuneration did not exceed 66 2/3 percent of her average weekly wages in any of those segments. (See attached appendix: CALCULATIONS OF AGGREGATE REMUNERATION.) Thus, GM is not entitled to a credit toward its workers' compensation obligation pursuant to LSA-R.S.23:1225(C)(1).

CONCLUSION
For the foregoing reasons, we conclude the Reimbursement Agreement is unenforceable. Without an "agreement to the contrary," the LSA-R.S. 23:1225(C)(1) provision for a reduction of workers' compensation benefits for aggregate remuneration is grounded on the requirement that the employee's aggregate remuneration from the listed sources exceeds 66 2/3 percent of the employee's weekly wages. Because the weekly sickness/accident benefits (with salary deductions excluded as the judgment requires), when added to the weekly workers' compensation benefits due, do not exceed 66 2/3 of Jones's weekly wage, GM is not entitled to the statutory credit.

DECREE
Having found GM is not entitled to a credit, we reverse the portion of the judgment awarding a dollar-for-dollar credit. In light of the workers' compensation benefits previously paid by GM from March 29, 1999, through May 21, 1999, we amend the judgment to award Jones temporary total disabilities from May 22, 1999, (instead of from March 29, 1999) through June 7, 1999. The portion of the judgment, as amended by the court of appeal, awarding supplemental earnings benefits from June 8, 1999, through February 9, 2000, is unaffected by this decision.
REVERSED, AMENDED AND RENDERED.
VICTORY, J., dissents and assigns reasons.

 APPENDIX
 CALCULATIONS OF AGGREGATE REMUNERATION:
02/01/99 through 03/28/99:
1. Net sickness/accident benefits paid weekly 0.00
 ($123.00 paid less $123.00 salary deduction)
2. Weekly workers' compensation benefits 367.00
 ________
3. Total 367.00
4. Two-thirds of average weekly wage 777.40
5. Offset due (amount of 3 that exceeds 4) 0.00
03/29/99 through 05/21/99:
1. Net sickness/ accident benefits paid weekly 215.40
 ($490.00 paid less $274.60 salary deduction)
2. Weekly workers' compensation benefits 367.00
 ________
3. Total 582.40
4. Two-thirds of average weekly wage 777.60
5. Offset due (amount of 3 that exceeds 4) 0.00
05/22/99 through 11/30/99:
1. Net sickness/ accident benefits paid weekly 215.40

*1121
 ($490.00 paid less $274.60 salary deduction)
2. Weekly workers' compensation benefits 367.00
 ________
3. Total 582.40
4. Two-thirds of average weekly wage 777.60
5. Offset due (amount of 3 that exceeds 4) 0.00
12/01/99 through 12/31/99:
1. Net sickness/ accident benefits paid weekly 208.71
 ($490.00 paid less $281.29 salary deduction)
2. Weekly workers' compensation benefits 367.00
 ________
3. Total 575.71
4. Two-thirds of average weekly wage 777.60
5. Offset due (amount of 3 that exceeds 4) 0.00
01/01/00 through 01/14/00:
1. Net sickness/ accident benefits paid weekly 207.55
 ($490.00 paid less $282.45 salary deduction)
2. Weekly workers' compensation benefits 367.00
 ________
3. Total 574.55
4. Two-thirds of average weekly wage 777.60
5. Offset due (amount of 3 that exceeds 4) 0.00
01/15/00 through 02/09/00 (26-day period):
1. Net sickness/ accident benefits paid weekly 620.00
 ($1,670.23 paid less $1,050.23 salary deduction)
2. Weekly workers' compensation benefits 1,363.15
 ________
3. Total ($76.27/day or $533.92/week) 1,983.15
4. Two-thirds of average weekly wage 777.60
5. Offset due (amount of 3 that exceeds 4) 0.00

VICTORY J., dissenting.
I respectfully dissent from the majority's opinion. La. R.S. 23:1225(C)(1) provides a ceiling for total employee remuneration as a result of work-related injuries, including both employer-funded benefit plans and any workers compensation benefits to which the employee may be entitled. It reduces any benefits which exceed "sixty-six and two-thirds percent of [an employees] average weekly wage," as a way to ensure that there is coordination in the total amount of employee disability payments, taking into account the different sources of these payments. However, this is only used as the basis for a reduction of benefits if there is not "an agreement to the contrary between the employee and employer." In other words, while normally any contribution above sixty-six and two-thirds percent would be the basis for a reduction in benefits, the statute allows the employer and employee the liberty to come to their own agreement regarding reduction of benefits, regardless of whether the aggregate benefits under La. R.S. 23:1255(C) exceed sixty-six and two-thirds percent of the employee's weekly wages.
Here, General Motors and its employees opted out of the "sixty-six and two-thirds" level of maximum remuneration, instead making an "agreement to the contrary." In this agreement, and in consideration of the considerable benefit package with which the employees were provided, the employee agreed to "repay ... the lesser of ... the Workers Compensation benefits... or [the] Sickness and Accident and Extended Disability payments [i.e. the employer-funded benefit plan]" if both were paid during the same period of time. Thus, if the employee was receiving benefits under both Workers Compensation *1122 and the Employer-Funded Benefit Plan simultaneously, the employee has agreed to repay General Motors the lesser of these two amounts. Contrary to the holding of the majority, in my view their agreement was enforceable as "an agreement to the contrary" under La. R.S. 23:1225(C)(1). For the foregoing reasons, I would affirm the ruling by the court of appeal, which enforced the parties' contract.
NOTES
[1] Jones returned to work in February of 2000, at the same job subject to certain restrictions. Shortly after Jones returned to work, she suffered another injury and was forced to take sick leave. That injury is not a part of this appeal. Jones moved to Arlington, Texas, in October 2000, and commenced working for the GM plant in that location.
[2] The amount consists of payments of $123.00 for 8 weeks, $490.00 for 42 weeks, and $1,670.23 for January 15, 2000, through February 9, 2000.
[3] The amount consists of overpayments of sickness and accident benefits through January 14, 2000, of $12,563.67 ($13,749.96 less $1,186.29 in payments for another injury) plus overpayments of extended disability benefits from January 15, 2000, through February 9, 2000, of $1,050.23.
[4] Louisiana Revised Statutes 23:1221(3) provides, in pertinent part:

(a) For injury resulting in the employee's inability to earn wages equal to ninety percent or more of wages at time of injury, supplemental earnings benefits equal to sixty-six and two-thirds percent of the difference between the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis. Average monthly wages shall be computed by multiplying his "wages" by fifty-two and then dividing the quotient by twelve.
Louisiana Revised Statutes 23:1202 provides, in pertinent part:
(2) For injuries occurring on or after July 1, 1983, the maximum weekly compensation to be paid under this Chapter shall be seventy-five percent of the average weekly wage paid in all employment subject to the Louisiana Employment Security Law, and the minimum compensation for total disability shall be not less than twenty percent of such wage, said maximum and minimum to be computed to the nearest multiple of one dollar. There shall be no minimum compensation for benefits payable pursuant to R.S. 23:1221(3) or (4). In any case where the employee was receiving wages at a rate less than the applicable minimum compensation, the compensation shall be the employee's "wages". In no event shall monthly Supplemental Earnings Benefits exceed four and three tenths times temporary total disability benefits.
B. For the purposes of this Chapter, the average weekly wage in all employment subject to the Louisiana Employment Security Law shall be determined by the administrator of the Louisiana Employment Security Law on or before August first of each year as of the quarter ending on the immediately preceding March thirty-first of each year. The average weekly wage so determined shall be applicable for the full period during which compensation is payable when the date of occurrence of injury falls within the twelve-month period commencing September first following the determination.
Although LSA-R.S. 23:1221(1) ostensibly allows for 66 2/3 percent of the employee's weekly wage, that amount, in turn, is subject to a maximum weekly workers' compensation amount provided for in Section 1202. Thus, although 66 2/3 percent of Jones's weekly wage is $777.60 (66 2/3 percent of $1166.40), the actual maximum workers' compensation benefits she was entitled to is $367.00 based on the provisions of Section 1202.
[5] Louisiana Revised Statutes 23:1221(3) provides, in pertinent part:

(a) For injury resulting in the employee's inability to earn wages equal to ninety percent or more of wages at time of injury, supplemental earnings benefits equal to sixty-six and two-thirds percent of the difference between the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis. Average monthly wages shall be computed by multiplying his "wages" by fifty-two and then dividing the quotient by twelve.
[6] The court of appeal noted that in P-16 GM demanded and apparently was receiving payment from Jones for overpayments of sickness/accident benefits under the Benefits Program due to Social Security disability payments which she received for the period February 1, 1999, through March 22, 2000. Except for excluding the salary deduction amounts from the credit granted to GM, the WCJ did not address the reimbursement. Nor was the reimbursement discussed by the court of appeal.
[7] The remaining provisions of the judgment are not contested and will not be addressed in this opinion. Also, GM did not apply for a writ to this court, thus abandoning its argument that the award of additional compensation benefits was erroneous.
[8] The decision rendered by the court of appeal amended the judgment to award temporary total disability benefits to Jones until June 7, 1999 (rather than June 21, 1999) and supplemental earnings benefits from June 8, 1999 (rather than June 22, 1999) through February 9, 2000. The amendment did not affect the total amount of the award.
[9] See text of LSA-R.S. 23:1225(C)(1), infra.
[10] Louisiana Revised Statutes 23:1225(C)(3) provides:

If an employee is receiving both workers' compensation benefits and disability benefits subject to a plan providing for reduction of disability benefits, the reduction of workers' compensation benefits required by Paragraph (1) of this Subsection shall be made by taking into account the full amount of employer funded disability benefits, pursuant to plan provisions, before any reduction of disability benefits are made.
[11] The court determined LSA-R.S. 23:1225(C)(3) was designed to allocate the offset to the compensation insurer where both the insurer and a disability plan seek to employ the offset.
[12] In her motion for rehearing, Jones argued, in the alternative, that the court of appeal erred in failing to address whether the Reimbursement Agreement between GM and herself was a violation of the Employment Retirement Income Security Act of 1974 (ERISA). The court of appeal found the Reimbursement Agreement was authorized by and enforceable under the Louisiana Workers' Compensation Law. The court of appeal indicated that GM was asserting rights to a credit to its compensation obligation and was not seeking a money judgment in favor of the disability plan. Because of our disposition of this matter, it is unnecessary to consider the ERISA argument.
[13] In Hughes, the court of appeal enforced a nearly identical reimbursement agreement and allowed the employer to take a dollar-fordollar credit against workers' compensation benefits for sums paid under an employerfunded group disability plan. However, on the date of the accident in Hughes, paragraph C of Section 1225 had not been enacted. The statute in place at the time of the accident is the applicable law. Thus, the court did not consider the application of the statutory provision that is at issue in the instant case. Section 1225(C)(4) provides that this law prevails over other laws. Assuming for the sake of discussion that the sickness/accident benefits paid were "not due and payable" to Jones, Section 1225(C)(1) now applies in the instant case in lieu of Section 1206 pursuant to Section 1225(C)(4).

This rather belated argument of GM is not persuasive.
[14] The legislature also enacted LSA-R.S. 23:1225(B), which provides that no workers' compensation benefits (whether for total disability or SEB payments) are payable for any week in which the employee has received unemployment compensation benefits.
[15] Underlining indicates wording added to this paragraph by Act 469 of 1991. The title of the act refers to the legislation as "remedial" and states the purpose was to provide for "a reduction in benefits when other benefits are received" and to provide for a "maximum aggregate remuneration."

The Digest of the act states that when Act No. 454 of the 1989 regular session was enacted, some language of the prior law was omitted through typographical error. The 1991 amendment, according to the Digest, inserts the omitted language and retains the original sense of the prior law, providing that benefits due under state workers' compensation law shall be reduced, unless there is an agreement to the contrary between the employee and employer, if an employee receives the benefits now designated as "a" through "d."
The amendment was introduced as House Bill No. 506. At the committee hearings, testimony by representatives of diverse interests, such as Wayne Fontana and Clark Cosse for the Louisiana Association of Business and Industry and Carey Simoneaux for the AFL-CIO, was heard in support of the bill.
The Act passed through both chambers of the legislature and their respective committees without amendment and by overwhelming majorities.
The parenthetical phrase allowing an agreement between the employer and employee is not mentioned in the title of the act, and the legislative history sheds no light on precisely what type of agreement was contemplated by the legislature.
[16] We note the Reimbursement Agreement was not signed by a representative of GM and appears to be in the nature of a release by Jones "[i]n consideration of" possible future payments from the Benefits Program that may or may not be forthcoming. The document was presented to Jones for her signature nine days after the on-the-job accident, when she was injured, unable to work, and receiving no wage-loss benefits whatsoever. The Reimbursement Agreement offered to Jones an apparently simple means of obtaining a flow of money at a time she was in need. GM, as employer and Benefits Program provider/administrator, had the superior advantage and power either to immediately pay benefits to an injured employee or to contest the amounts. Without the ability to review the Benefits Program provisions, it is impossible to determine GM's obligation.
[17] We in no way suggest an employer and employee cannot confect an agreement related to a benefits package. Indeed, such a benefits package can serve the employee by providing benefits for the employee hurt off the job, which injury would not be covered by workers' compensation.
[18] For an illustration of the differences between a dollar-for-dollar credit and a weekby-week offset, see, Green v. New Orleans Saints, 00-0795 (La. 11/15/00), 781 So.2d 1199.
[19] For an example of the method of calculating an offset, see Niles, Juge and Cosse, LABI Workers' Compensation Desk Book, Ch. 11, p. I-25 (1990).
[20] P-16 represents a unilateral demand on GM's part. GM has not cited any authority for the proposition that the reductions to the sickness/accident benefits due to Jones's receipt of Social Security disability benefits are authorized by statute or the jurisprudence. Indeed, the authorities state otherwise.

In 1978, the legislature added LSA-R.S. 23:1225 (now R.S. 23:1225(A)) to the Louisiana Workers' Compensation Law to provide a "reverse offset loophole" that allows workers' compensation benefits for permanent total disability to be offset by Social Security disability benefits to the extent that the combined amount, absent the law, would result in a reduction of the Social Security payments. 13 WEX MALONE & H. ALSTON JOHNSON, III, LOUISIANA CIVIL LAW TREATISE: WORKERS' COMPENSATION LAW AND PRACTICE, § 289 at 732 (4th ed., 2002). The legislature limited the 1978 reverse offset provision to workers' compensation benefits for permanent total disability. An employer of a worker who was neither entitled to nor receiving workers' compensation benefits for permanent total disability cannot claim the reverse offset of Section 1225(A). Garrett, 95-0017 at 7, 660 So.2d at 845. After the 1978 legislation which limited the reverse offset to benefits for permanent total disability, the federal government established a cutoff date of February 18, 1981, for the states to enact reverse offset provisions, or add to or alter the scope of an existing state reverse offset statute. The result was that Louisiana employers receive the advantage of the reverse offset reduction only when the employee is permanently totally disabled. Al Johnson Construction Company, 98-2564 at p. 8, 734 So.2d at 627. Thus, because Jones was not permanently totally disabled, GM's action in claiming the reduction appears to be proscribed by the statutory provisions and the jurisprudence.
Additionally, Louisiana Revised Statutes 23:1225(A) provides that "there shall be no reduction in benefits provided under this Section for the cost-of-living increases granted under the federal law after the date of the employee's injury." Despite this clear wording, GM's calculations of "overpayments" evidenced by P-16 include figures that represent two such cost-of-living increases.
Nor has GM shown that the Benefits Program provisions provide for recovery of amounts equivalent to Social Security benefits received by Jones. Nevertheless, Jones has acquiesced in the P-16 reductions, as she has not made them an issue in this litigation.